**Joseph AIUPPA, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 9243.**

United States Court of Appeals
Tenth Circuit.

April 25, 1968.

Maurice J. Walsh, Chicago, Ill. (John Powers Crowley, Chicago, Ill., with him on brief), for appellant.

Newell A. George, Kansas City, Kan., for appellee.

Before MURRAH, Chief Judge, LEWIS, Circuit Judge, and CHRISTENSEN, District Judge.

MURRAH, Chief Judge.

On first appeal from a jury-waived trial and conviction for unlawful possession and transportation of migratory birds, 16 U.S.C. § 703, we remanded this case for a new trial with directions to suppress, as evidence, contraband [560 frozen mourning doves] seized as the fruits of an unlawful search. Aiuppa v. United States, 10 Cir., 338 F.2d 146. On this appeal from a jury conviction and sentence on the same counts Aiuppa asserts numerous other grounds for reversal. After careful consideration of each point raised, we affirm the judgment.

Aiuppa first contends here that the Government should have been required to elect between Counts I and II of the Information. The argument is to the effect that since Count I charged possession of the birds and Count II charged transportation, and since it is necessary to have possession in order to transport, the two counts are necessarily merged. Little need be said concerning this contention, for it is conceded, as indeed it must be, that where the same act or transaction constitutes a violation of two distinct statutory provisions, the traditional test of identity of offenses is whether the same evidence is required to sustain them. See Rawls v. United States, 10 Cir., 162 F.2d 798; Beacham v. United States, 10 Cir., 218 F.2d 528, and cases cited; Robinson v. United States, 10 Cir., 366 F.2d 575. We think the charges here were sufficiently separate and distinct. Under Count I proof was required to show that Aiuppa had in his possession migratory birds in excess of the number allowed by statute (24 per person). Under Count II it was necessary to prove that he did some act in furtherance of the transportation

of such birds. Moreover, no where in the record before us can we find where the appellant raised such an objection at trial.

■■ Objection is next raised to the testimony of the Government's witness, Andrew Williams, on the grounds that such testimony was the result of an investigative lead obtained from the illegal search. It is argued that Williams was not interviewed by the Government until after the illegal search and that the Government failed to sustain the burden of establishing that the lead did not emanate from that search. Suffice it to say that the record clearly reflects that prior to the illegal search the Government received information from an informer to the effect that Aiuppa had been hunting in the Frontenac-Pittsburg, Kansas, area with well-known people; that "they had killed an enormous amount of doves" and that Williams was cleaning the doves, packaging them and placing them in cold storage. Since knowledge of these facts was gained prior to and independently from the illegal search, they may be proved like any other facts. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319. Such independently gained information does not become tainted merely because the same information is subsequently discovered during an illegal search. See Burke v. United States, 1 Cir., 328 F. 2d 399.

It is also urged that even considering the testimony of Andrew Williams, the evidence was insufficient to prove that Aiuppa either possessed or transported mourning doves in excess of the statutory limit [24 per person or a total of 48 for Aiuppa and his wife]. The argument is that there was no direct testimony that the birds in question were mourning doves protected under the provisions of § 703 and that the only testimony as to how many birds were placed in Aiuppa's automobile consisted solely of assumptions and guesses.

■■ Many times we have said that in determining the sufficiency of the evidence to support a jury verdict, we are constrained to view the evidence in the light most favorable to the Government and to examine such evidence only to determine whether the jury was justified in finding beyond a reasonable doubt that the defendant was guilty of the offense charged. See Elbel v. United States, 10 Cir., 364 F.2d 127; Van Nattan v. United States, 10 Cir., 357 F.2d 161; Reed v. United States, 10 Cir., 377 F.2d 891. And, it is equally important to bear in mind that in so viewing the evidence it is not our function to determine the weight of the evidence or assess the credibility of the witnesses. See Lucas v. United States, 10 Cir., 355 F.2d 245, and cases cited. Applying these rules, we cannot say the evidence here did not support the verdict. Andrew Williams testified that during approximately a two-week period he cleaned between nine and fourteen hundred mourning or turtle doves and placed them in plastic bags for various hunters, including Aiuppa, in the Frontenac-Pittsburg, Kansas, area; that these doves were then placed in cold storage in the Dairy Land Freezer in Frontenac; that he placed approximately ten doves in each plastic bag and then filled "ordinary freezers" with the plastic bags. Without giving linear dimensions Andrews indicated by hand motions to the jury the approximate size of the freezers or cartons in which the bags of doves were placed.[1] He also testified that he placed one of these cartons in the rear of Aiuppa's car and thereafter saw where three others had been placed in the rear of the car; that Mr. and Mrs. Aiuppa were sitting in the car and that he (Williams) directed them as to the best way to "get out of town to Missouri". By way of identifying the contraband game, Mrs.

---

1. We think it can safely be assumed that each "freezer" held more than one plastic bag of ten doves.

601

Williams testified that she assisted her husband on at least one occasion in cleaning some mourning or turtle doves. Ronald Tims also testified that he assisted Mr. Williams in cleaning turtle doves. From all of this evidence we think the jury was justified in finding that Aiuppa possessed and transported more than 48 mourning doves in violation of § 703.

Complaint is next made of the prosecutor's commenting on the memory of witness Williams and calling as witnesses two other persons who had previously informed him they would refuse to testify. During the trial, while Government witness Williams was testifying on direct examination and having difficulty recalling specific details, the prosecutor asked him, "Who told you to have a faulty memory?". Aiuppa's counsel immediately objected and upon motion the Court ordered the testimony stricken and directed the jury to disregard it.

We agree with appellant that the statement by the prosecutor was unnecessary and improper. But, every slight excess of the prosecutor does not require that a verdict be overturned and a new trial ordered. United States v. Borda, 4 Cir., 285 F.2d 405. And, such an error can generally be cured, as indeed it was here, without harmful effect upon a defendant by the trial court's striking the testimony or comment and admonishing the jury to disregard it. Lawrence v. United States, 10 Cir., 357 F.2d 434; Drew v. Lawrimore, 4 Cir., 380 F.2d 479, and cases cited; and see Singer v. United States, 380 U.S. 24, 38, 85 S.Ct. 783, 13 L.Ed.2d 630.

As to the allegation that the Government prejudicially called two witnesses who had advised the court they would invoke the protection of the Fifth Amendment and refuse to testify, both sides rely upon United States v. Compton, (CA 6), 365 F.2d 1, 5, wherein the court stated:

"Government counsel need not refrain from calling a witness whose attorney appears in court and advises court and counsel that the witness will claim his privilege and will not testify. However, to call such a witness, counsel must have an honest belief that the witness has information which is pertinent to the issues in the case and which is admissible under applicable rules of evidence, if no privilege were claimed. It is an unfair trial tactic if it appears that counsel calls such a witness merely to get him to claim his privilege before the jury to a series of questions not pertinent to the issues on trial or not admissible under applicable rules of evidence."

It is argued that there was no showing by the Government that either of these witnesses had information pertinent to the issues in the case, and that the only purpose for calling them was to get them to claim privilege before the jury, leaving the inference they were hiding something.

The record indicates that a Kansas attorney appeared during the trial and informed the court that he represented "a number of witnesses who feel that they should, under the circumstances, refuse to testify as they might incriminate themselves." No where can we find where the "number of clients" were identified by name or that these two witnesses were identified as being among those represented by the attorney. Moreover, both of these witnesses had testified in the first trial and in this trial were asked only a few pertinent questions, such as whether they had hunted with the accused. Immediately upon claiming the privilege of the Fifth Amendment, each was excused from further testifying. We cannot say that the Government did not honestly believe the witnesses had pertinent information nor that under the circumstances it was prejudicial to attempt to elicit such information from them.

■■■■■■ The next allegation of error is directed at the court's permitting two government agents each to testify to the effect that he is employed by the Department of Interior and is custodian of the records in his respective region; that he had searched the records in his region and could find no record of an application or permit for Aiuppa to possess more than the statutory limit of mourning doves. The argument is to the effect that the best evidence would have been the records themselves and that failure of the witnesses to produce the the records from which they made their search deprived Aiuppa of his constitutional right to cross-examine witnesses against him. Reliance is placed upon United States v. Rohalla (CA 7), 369 F. 2d 220, wherein the court held it was prejudicial error to permit an F.B.I. agent to testify that he had examined a license registration book published by the Secretary of State's office and had determined that a certain license number was issued to the defendant, Rohalla. The court in that case reasoned that "There was no way that defense counsel could by cross-examination of agent Williams effectively challenge the authenticity or accuracy of a book that was not produced in court." Id. 224. But, we think that case is easily distinguished from ours. In Rohalla the Government was attempting to prove an entry in an official book, but the agent testifying did not purport to be the official custodian of the records he had examined. And, the court was careful to note that "The book which should have been produced in open court was available to the government and was at that time in the same building where the trial was being conducted." In our case the Government was attempting to prove the absence of an entry in an official set of records by the testimony of the of-ficial custodians. Rule 27 F.R.Cr.P. and Rule 44(b) F.R.Civ.P. specifically provide that "A written statement that after diligent search no record or entry of a specified tenor is found to exist in the records designated by the statement * * * is admissible as evidence that the records contain no such record or entry." And, Rule 44(c) provides that "This rule does not prevent the proof of * * * lack of entry therein by any other method authorized by law." Thus, "to establish the fact that there is no record as to a particular matter or thing, parol evidence may be given." Jackson v. United States, 5 Cir., 250 F.2d 897, and authorities cited. We can, therefore, see no error in allowing the Government to negate the issuance of a permit to Aiuppa without producing the records. And, see also dissent in United States v. Rohalla, supra.

■■■■■■ Aiuppa next urges that it was prejudicial error for the trial court to instruct the jury that

"The law does not compel a defendant in a criminal case to take the witness stand and testify, and no presumption of guilt may be raised, and no inference of any kind may be drawn, from the failure of a *defenant* to testify.

"The legal theory for this rule is immaterial so far as you are concerned, but the important and vital point for you, as jurors, is that a defendant has the unqualified right not to take the stand and you may not in any manner draw any inference against the defendant because he did not take the stand."

It is argued that the language of the instruction amounts to a prejudicial comment on the failure of a defendant to take the stand, prohibited in Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106.[2] But, we

**2.** In Griffin the court was concerned with the California "Comment Statute" which provided that a defendant's failure "to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury." The Supreme Court held that this violated the Fifth Amendment prohibition against self-incrimination.

cannot agree. We know, of course, that such an instruction must be given if requested, i. e. see United States v. Schabert, 2 Cir., 362 F.2d 369, and cases cited. While it may be the better practice not to charge on this subject unless specifically requested by a non-testifying defendant, it is not reversible error to do so. Id. 372. Cf. Knowles v. United States, 10 Cir., 224 F.2d 168; Collins et al. v. United States, 10 Cir., 383 F.2d 296. When couched in such careful terms as used here, we do not think the charge can be said to be more than "a faithful compliance with the 'implied direction' given district judges by Congress to fulfill 'their traditional duty in guiding the jury by indicating the considerations relevant to the latter's verdict on the facts.'" Coleman v. United States, 10 Cir., 367 F.2d 388, citing and quoting from Bruno v. United States, 308 U.S. 287, 293, 60 S.Ct. 198, 84 L.Ed. 257. See also United States v. Tannuzzo, 2 Cir., 174 F.2d 177; Affronti v. United States, 8 Cir., 145 F.2d 3.

Lastly, Aiuppa contends that it was error for the trial court to refuse to grant a mistrial based upon prejudicial newspaper publicity, or, in the alternative, to at least voir dire the jurors whether they had read the newspaper publicity and were prejudiced thereby. He further argues that it was error for the court to permit the jury to separate for lunch during their deliberations and prior to the verdict so as to expose them to the prejudicial publicity and other possible influencing factors.

At the conclusion of all the evidence, and before the jury had been instructed, Aiuppa's counsel moved for mistrial on the grounds that the jury could not "reasonably give us a fair trial" due to two current newspaper stories. One of these stories was published on the first day of trial in the Kansas City Star and was headlined on page 4, "Jury Selected in Aiuppa Case. Chicagoan's Trial in U. S. District Court in Fort Scott Kansas." A subheadline read "Gangland Figure Found Guilty in 1963 but Won Appeal".

The article went on to discuss Aiuppa's first trial, conviction and sentence and the suppression by this court of "more than 500 doves" found "in the trunk of the Aiuppa Cadillac". The second article was published on the second day of trial in the Kansas City Times and was headlined, "Two Freeze Up in Aiuppa Case; Government Witnesses Refuse to Answer in Second Trial. Now Vague on Details". A subheadline erroneously read, "Judge Asks One 'Who Told You' to Forget Answers?" This article then recited various occurrences at the trial.

Judge Templar noted that "this has always been a problem for the trial courts, and under the provisions of the First Amendment I know of no way that this court can prevent an irresponsible newspaperman from publishing anything he wishes to publish * * *. This is apparently presenting some very serious problems for the courts * * *." But, he determined that "in order to grant a mis-trial in this case [the Court] would have to assume that the jurors have read this article and that it had left an impression and they believed what they read and took it into consideration. Now, the Court is specifically instructing them not to do this, and the Court feels that to grant your request [for voir dire of the jury] will not be proper. In fact it would have just the opposite effect in the establishment of a fair trial because it would then call to their attention something that may not have arrived at their attention." Thereafter, the court instructed the jury to the effect that "you are to disregard any information about this case which may have been received from sources outside of this trial. If any of you have read any newspaper articles or heard any radio broadcasts or telecasts related to this case, I want to caution you particularly that you are to put any such information entirely out of your consideration of this case, and you are to confine your consideration solely to the evidence adduced in this trial."

Each case relating to a claim of jury prejudice based on news-

**604**

paper articles appearing during a trial must turn on its own special facts. See Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250. We have very recently considered the general problems confronting and principles applicable to the majority of cases of this type concluding that "The right to publish a prejudicial article does not carry with it the right of an accused to an automatic mistrial." Mares v. United States, 10 Cir., 383 F.2d 805. We cannot say, from the facts in this case, that the published newspaper stories deprived Aiuppa of a fair trial. The stories were, to be sure, prejudicial. But, they were published in newspapers at least 100 miles from the scene of the trial. And, there is nothing in the record to indicate that they were generally circulated, or for that matter circulated at all, in the vicinity of the trial or that the jurors would likely be exposed to them outside of deliberately seeking them out. We will not presume either exposure or prejudice, i. e. see Welch v. United States, 10 Cir., 371 F.2d 287, nor will we, in a case like this, impute to a jury a disregard of its duty to confine its verdict to the evidence adduced at the trial. And see Mares v. United States, supra. We think the trial judge took reasonable precautionary steps under the circumstances by instructing the jury to disregard any such publicity it might encounter.

■ As to whether the jury should have been allowed to separate for lunch, we have said that "sequestration imposes a hardship on jurors and should be ordered only in unusual cases." Mares v. United States, supra. As we have seen, there is nothing in the record to indicate that the jurors were exposed to the newspaper articles in question. And, we will not presume prejudice from such a separation where, as here, the trial court properly admonished the jury in regard to their conduct during separation. See Roth v. United States, 10 Cir., 339 F.2d 863; and see Hines v. United States, 10 Cir., 365 F.2d 649.

The judgment is affirmed.