**Edward Byron HALE, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**Nos. 26199, 26200.**

United States Court of Appeals, Fifth Circuit.

Oct. 7, 1970.

Rehearing Denied and Rehearing En Banc Feb. 2, 1971.

James Garrett, Watkins C. Johnston, Charles E. Porter, Jesse M. Williams, III, Nicholas T. Braswell, III, Rushton, Stakely, Johnston & Garrett, Montgomery, Ala., O. S. Burke, Burke & Burke, Greensboro, Ala., for appellant.

Don Conway, Asst. U. S. Atty., Vernol R. Jansen, Jr., U. S. Atty., Mobile, Ala., for appellee.

Before WISDOM and DYER, Circuit Judges, and KRENTZMAN, District Judge.

KRENTZMAN, District Judge:

This case involves a man who thought he could fool all of the people all of the time. He misled the townspeople for a while, but he did not mislead the jury. Although we do not agree with every ruling or comment made by the trial court below, we find no reversible error and affirm.

Appellant Edward Byron Hale was president of the only bank in Pine Apple, a small community (population 350) in rural Alabama, from 1956 until the closing of the bank on January 31, 1967.

Three indictments were returned against appellant Hale charging him in 20 counts with violations of 18 U.S.C.A. §§ 656 (misapplication by bank officer) and 1005 (false bank entries). Following a jury trial, appellant was found guilty on 10 counts.

Appellant raises numerous allegations of error, only four of which warrant discussion. These we proceed to discuss in the order they were tendered by appellant.

### THE SUPPLEMENTAL CHARGE TO THE JURY

The trial of this case continued for almost two weeks. Having been unable to reach a verdict after three hours of deliberation, the jurors were allowed to retire to their homes for the night to report at 9:00 a. m. the next morning for further deliberation and instruction.

Upon the reassembling of the jury the following morning, the trial judge, having first dictated into the record an objection by both sides as to everything he was to say, further charged the jury as to its duties and responsibilities in the case. This additional charge was given on the court's own motion; no request for further instructions had been made by the parties or the jury. The supplemental charge is set out in the margin.[1]

1. This is an important case. The trial has been long and expensive. Your failure to agree upon a verdict will necessitate another trial equally as expensive. The Court is of the opinion that the case cannot be again tried better or more exhaustively than it has been on either side. It is therefore, very desirable that you should agree upon a verdict. The Court does not desire that any juror should surrender his consciousness (sic) convictions. On the other hand, each juror should per-

form his duty conscientiously and honestly, according to the law and the evidence. And, although the verdict which a juror agrees must, of course, be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusions of his fellows, yet, in order to bring 12 minds to a unanimous result, you must examine the question submitted to you with candor, and with a proper regard and difference (sic) to the opinions of each other.

You should consider that the case must at sometime be decided, that you are selected in the same manner and from the same source from which any future (jury) must be, and there is no reason to suppose that the case will ever be submitted to 12 jurors more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on one side or the other.

In the present case, the burden of proof is on the United States to establish its case beyond a reasonable doubt, and if, upon any count of the indictments submitted to you, you have a reasonable doubt, based upon the evidence, of the guilt of the Defendant, you ought to acquit him on that count.

But, in conferring together, you ought to pay proper respect to each other's opinion with a disposition to be convinced by each other's arguments.

And, on the one hand, if much the larger number of your panel are for conviction, a dissenting juror should consider a doubt in his mind is a reasonable one which makes no impression upon the minds of so many men, equally honest, equally intelligent with himself, who have heard the same evidence, with the same attention, and with an equal desire to arrive at the truth, and under the sanction of the same oath.

And, on the other hand, if the majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably, and ought not to, doubt the correctness of the judgment which is not concurred in by most of those with whom they are associated, and discussed the weight or sufficiency of that evidence which failed to carry conviction to the minds of their fellows.

In order to acquit the Defendant of the 20 charges submitted to you, you must consider all of them, and find that he is not guilty of any one of them. On the other hand, if you find he is guilty of any one of them, you should return a verdict of guilty.

It might be that you are confused in this, the indictment number 15,138 is in 8 counts. You do not have to reach the same conclusion in all 8 counts. You reach your conclusion based on the evidence.

I do not think it is a complicated case. I am not trying to have any effect on your decision. I want you to decide the cases. You decide if he is guilty or is he not guilty.

In the first count in indictment 15,138, I think it is this simple, if you believe the testimony of Fred C. Myrick then the Defendant is guilty. In that count, if you believe the testimony of Edward Byron Hale, then he is not guilty.

In the second count, I think it is this simple, if you believe the testimony of Robert L. Prayer, then the Defendant is guilty. If you believe, in that count, the testimony of Edward Byron Hale, then he is not guilty. I think you can go down each count and each indictment and I think that is your solution.

Now, you could not have to find or you do not have to reach the same result in each count. Each count stands alone by itself. That is true of each of the 8 counts in the indictment numbered 15,138. That is true of the 6 counts in the indictment numbered 15,139 and that is true in the 6 counts in the indictment numbered 15,140.

Now, I again say I want your verdict to be your own decision. However, all 12 of you have heard the same evidence. You have taken the same oath. You are equally as conscientious and equally as intelligent as the other, and as I stated, if much the larger number of your panel are for conviction, a dissenting juror should consider a doubt in his mind is a reasonable one which makes no impression upon the minds of so many men, equally honest, equally intelligent with himself, who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath.

And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably, and ought not to, doubt the correctness of a judgment which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which failed to carry conviction to the minds of their fellows.

Now, I hope you can arrive at verdicts on all 20. If you cannot, then arrive at verdicts on as many of these counts as you possibly can.

Now, with that instruction, I am going to ask you to please go back to the jury room and see if you cannot arrive at verdicts in this case.

At the conclusion of the additional charge, and after the jury retired, appellant objected to the charge. The jury returned shortly thereafter with a verdict finding appellant guilty on 10 counts and innocent on 10 counts.

Appellant claims that the "Allen charge" coerced the jury into reaching a compromise verdict and advances five objections to the charge in support of this contention. In addition, appellant complains of that portion of the supplemental charge which directs the jury to believe either appellant or the government's main witness against him in considering each of the counts.

The Allen charge was authorized as a supplement to the main charge by the United States Supreme Court over 70 years ago. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Since then "it has persisted * * * not so much as an object of commendation as * * * a product of toleration." United States v. Fioravanti, 412 F.2d 407, 415 (3 Cir. 1969), cert. den. sub nom. Panaccione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88. The purpose of the Allen charge is to obtain a verdict. To this end it admonishes the jurors to listen to each other's arguments "with a disposition to be convinced."

█ Problems arise when the Allen charge is used to coerce the jury into reaching a verdict. Because a coercive charge violates due process, United States v. Brown, 411 F.2d 930 (7 Cir. 1969), courts scrutinize carefully allegations that a trial court in a supplemental charge compelled the jury to return a guilty verdict.[2] Recently there have been "unrelenting attacks on the Allen charge," United States v. Hill, 417 F.2d 279, 280 n. 3 (5 Cir. 1969), and several other circuits have severely restricted its use. United States v. Brown, supra; United States v. Fioravanti, supra. The position of this Court was expressed in Thaggard v. United States, 354 F.2d 735, 739 (5 Cir. 1965), cert. den. 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966):

> "This court, although sometimes reluctantly, has approved the 'Allen' charge while carefully assuring ourselves that there are not engrafted upon it any partial or one-sided comments. * * * Such a charge, so long as it makes plain to the jury that each member of the jury has a duty conscientiously to adhere to his own honest opinion and avoids creating the impression that there is anything improper, questionable, or contrary to good conscience for a juror to cause a mistrial * * * is still a permissible charge to be given in proper circumstances in this Circuit."

█ Turning to the supplemental charge at issue, we note that the first four paragraphs of the charge contain language almost identical to the supplemental charge approved in Thaggard v. United States, supra, 354 F.2d at 738–739 n. 2. We therefore reject appellant's claims of coercion based upon the trial court's statements that the trial had been long and expensive, with retrial to be equally as expensive, and that the case must at some time be decided.

█ Appellant next contends that the trial court erred when it twice charged the jury that the minority was to consider whether its views were reasonable

---

2. Verdicts have been reversed where the trial court charged the jury: "You have got to reach a decision in this case," Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965); where the instruction was that the minority must listen to the arguments of the majority with some distrust of their own judgment because the majority would have better judgment, Green v. United States, 309 F.2d 852 (5 Cir. 1962); where the jury was told that no juror should stand out stubbornly and that by following the law and the evidence the jury ought to be able to reach a verdict, Powell v. United States, 297 F.2d 318 (5 Cir. 1962); and where 'there was omitted from the charge a reminder that each juror should abide by his own conscientious objections, United States v. Rogers, 289 F.2d 433 (5 Cir. 1961).

in view of the majority's opposing views.[3] We do not believe that the emphasis given to this portion of the charge was error in the circumstances of the case.[4]

Appellant's fourth objection to the charge is that the trial court coerced the jury when it said:

"I do not think this is a complicated case. I am not trying to have any effect on your decision. *I want you to decide the cases.* You decide is he guilty or is he not guilty." (Emphasis supplied.)

■ In light of the rest of the charge we do not think these words reasonably can be interpreted to mean that the jury was "ordered" to come back with a verdict. The emphasized sentence, stressed by appellant as directly coercive, was preceded by this sentence: "I am not trying to have any effect on your decision." The passage quoted above can only have meant that the jury was to decide the case free of restrictions from anyone. Although we were not present when these words were uttered and the parties disagree as to the tenor in which they were delivered, we think a fair reading of the entire record fails to show that these words affected appellant's substantial rights.

■ Appellant's fifth attack on the supplemental charge is that it was coercive because it was unnecessary. We disagree. "Whether in any case the Allen charge should be given rests initially in the sound discretion of the trial judge." Powell v. United States, *supra,* 297 F.2d at 322. When the charge is to be given is also a matter of trial court discretion. Annotation, 100 A.L.R.2d 177, 180 (1965). Some courts hold that the coercive effect is minimized when the Allen charge is given *before* the jury retires; others make no distinction concerning when the charge is delivered. In An-drews v. United States, 309 F.2d 127, 129 (5 Cir. 1962), we held it "was in no manner erroneous" to give the Allen charge 65 minutes after the jury had begun deliberation. In the case sub judice we share the view of the Tenth Circuit:

"[T]he contention here is that since the [Allen] instruction was given before the jury had a reasonable opportunity to deliberate or disagree, it was coercive. We have expressed the view that an instruction of this kind is less likely to be coercive if given before the jury has indicated its inability to agree on a verdict; that in this posture of the jury's deliberations, it is intended and has the effect of inducing the jury to reason together toward a collective judgment." Burrup v. United States, 371 F.2d 556, 558 (10 Cir. 1967).

■ We have never said that the Allen charge is to be given in every case where there is a short period of deliberation by the jury. We do say, remembering that the "correctness of the charge must be determined by the consideration of the facts of each case and the exact words used by the trial court," Powell v. United States, *supra,* that the mere giving of the charge here was not error.

■ We begin our discussion of appellant's final objection to the supplemental charge by observing that in federal court it is a basic principle that the trial court may comment fairly upon the weight of the evidence, so long as it is made clear to the jury that it is the trier of fact and that the observations of the trial court are in no way binding.

"It is well settled that a federal district judge is not relegated to complete silence and inaction during the course of a criminal jury trial. He must, however, be most careful that his interventions are proper, timely, made in a fair effort to clear unanswered issues,

---

3. Appellant correctly does not contend that the mere giving of such a charge is error. Allen v. United States, *supra;* Thaggard v. United States, *supra;* contra, United States v. Fioravanti, *supra.* Appellant's position is that the trial court unduly emphasized these words by uttering them twice in the course of the Allen charge.

4. See our comments below on the repeated cautions given the jury that the verdict was to be its alone.

and are not prejudicial to defendant. Many federal decisions recognize the power of the judge, within reasonable limits, to comment on the evidence and to express fair opinions. This privilege, however, has been limited to the point where the trial judge is under a strict duty to direct the jury clearly that they are the sole judges of the facts and are not bound by the judge's questions or comments. Matters of fact unmistakably must be left to the jury." Bursten v. United States, 395 F.2d 976, 982–983 (5 Cir. 1968).

■ We think that the trial court properly cautioned the jury that it alone was the trier of fact. The court began the supplemental charge by telling the jurors they had already been charged correctly on the law. In that earlier charge, the court had said:

"During the course of the trial, I do not wish for you to conclude from anything I have said or in the course of these instructions, at anytime, that I have intended to directly or indirectly indicate any opinion on my part as to the facts or as to what I think your findings should be. From time to time, during the course of the trial, I have asked questions of witnesses and I have made comments as to the law and ruling upon objections and motions made by counsel for both sides. You are not to infer from these questions asked by me or such comments as I have made that the Court was thereby indicating any opinion as to the evidence or what your findings should be."

Elsewhere in the supplemental charge the judge told the jury that he did "not desire that any juror should surrender his consciousness [sic] conviction"; that as to each juror the verdict must be "the result of his own convictions"; that the jury was to decide the case; and that the jury was to "decide is he guilty or is he not guilty." Each comment on the evidence was prefaced by "I think." Shortly following his remarks on the evi-

dence, the judge said: "Now, I again say I want your verdict to be your own decision."

The record in this case exceeds 1,200 pages. We cannot detail each instance in which the determination of appellant's guilt may have been reduced to a question of the credibility of appellant as opposed to the credibility of the witnesses against him. But a careful examination of the record convinces us that the trial court did not err in opining that as to each of the charges the real issue was who to believe.

The government's case against appellant was two-fold. First, there was documentary evidence in the form of notes, mortgages, bank records, and other papers and documents. Second, there was the testimony of persons in the community concerning their dealings with appellant acting as President of the Bank of Pine Apple. The testimony tended to show that between 1963 and 1967 a series of transactions took place between appellant as bank president and others. The government's witnesses gave the facts underlying each of the transactions. They testified that in their dealings with appellant they had been duped. It was the testimony of these witnesses that the documentary evidence, while genuine, was the product of fraud, deception, or unauthorized conduct on the part of appellant.

Appellant's main case consisted of his testimony relating his version of the events of 1963–1967. It was quite different: the transactions in question were simply ordinary dealings in business or among friends; none of the other parties was misled, deceived, or left in ignorance; the documentary evidence was therefore perfectly explainable as the fruit of conscious decisions made by the parties with whom appellant was dealing. Appellant introduced his own documents into evidence, none of which really contradicted the government's documentary evidence, and called his own witnesses, only one of whom testified in such a way as to possibly cast doubt on the stories

of the government's witnesses.[5] The rest of appellant's case was comprised of attempts to impeach the character of the witness against him and to vouch for his own character.

With these configurations of the evidence in mind, it may be seen that the main factual dispute emerging at trial concerned the nature of the transactions between appellant and others. Appellant and the witnesses against him gave conflicting versions of what had happened. Each side claimed its version of the facts to be explanatory of the documentary evidence and consistent therewith. The jury could believe either appellant's story, which was often incredible, or those of his accusers, likewise often incredible but perhaps explicable as the result of greed or gullibility.

Comments on the evidence stronger than the one here have been approved by other courts. See, e. g., Young v. United States, 358 F.2d 429 (9 Cir. 1966). On the basis of the record in this case, the trial court's comments were permissible. The disagreement was not over the existence but the nature of the transactions between appellant and persons in the community; not over the authenticity of the documents but their origin. The government's witnesses testified that the transactions occurred in such a way that appellant had hornswoggled them and thereby committed the offenses charged. With the possible exception of the testimony of one defense witness, the only substantial challenge to their testimony was the testimony of appellant. Consequently the jurors were faced with a credibility problem: whom were they to believe? On ten of the charges they believed appellant's accusers.

### PUBLICITY

The trial began on April 30, 1968, in Selma, Alabama. Following the general qualification of the jury, appellant moved in chambers for a continuance until the next term of court, on the ground that there had been widespread publicity throughout the State of Alabama concerning the demise of the Bank of Pine Apple. In support of the motion, appellant introduced an article from the Montgomery *Advertiser* of April 26, 1968 and an article from the Alabama *Journal* of the same date. Appellant also asked for leave to attach as exhibits to the motion a series of newspaper articles from all over the State, transcripts of radio programs and newscasts, and copies of all telecasts on the subject shown in the previous three or four months.

The trial court granted leave to file the two newspaper articles, refused to admit the other publicity exhibits into evidence, and denied the motion for continuance.

The trial court next qualified the jury specifically, using its own questions and those requested by the parties. The qualification revealed that every member of the panel had read articles, heard broadcasts, or seen telecasts about the failure of the Bank of Pine Apple or the present case.

All the potential jurors indicated that their judgment would not be affected by the extraneous matter, and that they would be able to decide the case on the basis of the evidence alone. Both sides then announced to the court that they had no further questions to propound to the jury.

The motion for continuance was renewed immediately following the qualification of the jury, on the ground that all the jurors had read, heard, or seen something about the case. The motion was denied, as was a motion for mistrial made on the same basis.

No juror was challenged for cause by either side.

On the second day of the trial, May 1, 1968, appellant moved in chambers for a mistrial because of newspaper coverage of the trial published that day and the

---

5. This was witness Lyndol Bolton, whose testimony appears to have conflicted somewhat with the testimony of several of the victims that they had been bamboozled into signing blank documents.

previous day. In support of the motion, articles were introduced from the Birmingham *News*, the Birmingham *Post Herald*, the Alabama *Journal*, the Selma *Times*, and the Montgomery *Advertiser*. Complaining that the jury had not been charged to avoid reading publicity about the trial, appellant insisted that an inundation of publicity had made a fair trial impossible. The motion was denied.

At the end of the second day, the trial court instructed the jurors that they were not to read any articles or listen to any broadcasts concerning the trial.[6] After the jury had left for the day, appellant pointed out to the court that several of the jurors had sat with newspapers folded under their seats, whereupon the following colloquy took place:

"MR. GARRETT:

If your Honor please, I have noticed that some of the jurors have newspapers folded under their seats and we object to it * * *

THE COURT:

It is all right as far as I am concerned I did not instruct the jurors not to read papers. I don't care whether they were under the seat, sitting on them or under the chair or what. That is in the record.

MR. GARRETT:

All right. I want to have it in the record."

On the day of sentencing, May 14, 1968, appellant filed a motion for judgment of acquittal notwithstanding the verdict or in the alternative for a new trial. One of the grounds of the motion was that trial publicity had deprived appellant of a fair trial. Attached to the motion was another series of newspaper articles. The motion was denied.

Appellant contends that the trial court erred when it refused his request to continue the trial.[7]

"Due process requires that the accused receive a trial by an impartial jury free from outside influences." Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966).[8] Stated differently, "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair trial violates even the minimal standards of due process." Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

This does not mean that criminal cases must "be submitted to automated jurors existing in complete sterility." Welch v. United States, 371 F.2d 287, 291 (10 Cir. 1966), cert. den. 385 U.S. 957, 87 S. Ct. 395, 17 L.Ed.2d 303.

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse meth-

6. THE COURT * * * You are all excused until 9:30 in the morning. Now, a jury is to decide a case on the testimony that they hear from the witness stand. I am going to ask the jury —and it is quite all right for you to read papers, look at television, listen to the radio, but please do not read any articles concerning this trial or listen to any news broadcast concerning this trial. Now, that is no reflection on anybody, any newscaster, reporter or anything else, but the jury is to decide the case from what they hear on the witness stand.

Now, I have frequently made this illustration, but it is a good one or bad one. I can't distinguish what I hear through my right ear from what I hear through my left ear. Don't read articles about it nor listen to news broadcasts or telecasts about it. Get your information here.

See you in the morning at 9:30.

7. Appellant raises a related allegation: reversible error occurred when the court reporter below failed to record the special qualification of the jury, in violation of the Court Reporter Act, 28 U.S.C.A. § 753(b) (1). We need not deal with this issue, however, since a Supplemental Record on Appeal has been filed, which sets forth verbatim the special qualification voir dire.

8. A related concept is that the verdict must be based solely on the evidence adduced at trial. See Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).

ods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of the best qualified to serve as jurors will not have formed some impression as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, *supra*, 366 U.S. at 722–723, 81 S.Ct. at 1642.

■ Where an accused has alleged that he was deprived of due process because the jury was swayed by influences outside the courtroom, it is the duty of the appellate court to independently review the record, Gawne v. United States, 409 F.2d 1399, 1401 (9 Cir. 1969), and each case will depend on its own special facts. Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

■ The traditional rule[9] in such cases has been that there must exist a nexus between the community prejudice and jury prejudice; there must be a showing that "prejudice found its way into the jury panel." Pamplin v. Mason, 364 F.2d 1, 6 (5 Cir. 1966).

Recent Supreme Court decisions[10] have fashioned the principle that in certain extreme circumstances where there has been "inherently prejudicial publicity," McWilliams v. United States, 394 F.2d 41, 44 (8 Cir. 1968), the actual existence of prejudice in the jury box need not be shown.

Appellant is unclear in his assertions regarding the prejudicial effect of the publicity upon the jury, saying only that the jurors "were affected to the extent that a continuance should have been granted."

At voir dire all the members of the jury panel indicated that they had heard of the case, but no juror admitted bias or prejudice. All the jurors stated that anything they knew about the case would not hinder their ability to give both appellant and the government a fair trial. Appellant did not proffer further questions to the jurors as to the extent and nature of their knowledge of the case.

■ As stated above, potential jurors need not be totally ignorant of the facts of a case.[11] In this case the voir dire discloses only that the jurors knew of the case, that they swore that their knowledge would not affect their judgment, and that appellant did not inquire further into the matter. Appellant did not challenge a single juror for cause. On the basis of this record, appellant has failed to show that at the time of their empanelling the jurors were biased against him.

Appellant has also failed to show that prejudice seeped into the minds of the jurors during the trial.

■ The trial court admonished the jury to ignore publicity about the trial at the close of the second day of the

---

9. Irvin v. Dowd, *supra*; Stroble v. California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952).

10. Sheppard v. Maxwell, *supra*; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *compare* Turner ·v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (inherently prejudicial circumstances found where two deputy sheriffs who were principal witnesses for prosecution had charge of jury

during three-day trial and fraternized with them outside the courtroom during the performance of their duties).

11. "The fact that several jurors, *or all the members of a panel*, have read newspaper articles relating to a case does not disqualify them as jurors. This is true even though a juror may have had a preconceived notion as to the guilt or innocence of an accused." Evans v. Arizona, 410 F.2d 1122, 1124 (9 Cir. 1969). (Emphasis supplied.)

trial. This was not error in the circumstances of the case; appellant did not request such a charge until shortly before the time it was given.

The incident involving alleged newspapers under the jurors' seats hardly indicates jury prejudice. No one really knows what the jurors were reading. Appellant conjectures that it was trial publicity, but offers no proof of this. In urging us to believe that the jurors were reading such matter, appellant is requesting this Court to presume prejudice, something courts are loath to do. United States v. Acuff, 410 F.2d 463 (6 Cir. 1969); Sevey v. United States, 403 F.2d 691 (5 Cir. 1968); Aiuppa v. United States, 393 F.2d 597 (10 Cir. 1968).

The Supreme Court has reversed convictions without a showing of jury prejudice only in extreme situations. In Rideau v. Louisiana, *supra*, the defendant was televised confessing to the crimes with which he was charged; in Estes v. Texas, *supra*, the defendant's pretrial proceedings and trial were photographed and televised live, often in a state of bedlam; and in Sheppard v. Maxwell, *supra*, the defendant was the subject of "some of the most abusive and prejudicial news coverage of a criminal trial in modern judicial history." Margoles v. United States, 407 F.2d 727, 732 (7 Cir. 1969).

The trial proceedings here were unmarred by the press theatrics found in *Estes* and *Sheppard*; there were no courtroom antics of the news media to deprive appellant of "that judicial serenity and calm to which [appellant] was entitled." Estes v. Texas, *supra*, 381 U.S. at 536, 85 S.Ct. at 1629. Any inherently prejudicial circumstances must be sought outside the courtroom.

In decrying the publicity which preceded and surrounded his trial, appellant complains about the quantity of the publicity, not its quality.[12] Appellant nowhere asserts that the new reports were biased, that the prosecution "leaked" items to the press, that there were editorial comments demanding conviction to assuage public outrage, or that he was otherwise the subject of a trial by the news media.[13] In essence, appellant contends that he could not receive a fair trial because the press had covered extensively the events relating to the collapse of the Bank of Pine Apple.

We cannot accept the position that "prominence brings prejudice." Welch v. United States, *supra*, 371 F.2d at 291. "Such an outcome would give to the press a power over judicial proceedings which may not be countenanced." Mares v. United States, 383 F.2d 805, 808 (10 Cir. 1967). Where it is alleged that an accused was subjected to wide-

12. Appellant levels other allegations at the publicity, but none of them are sufficient to make a showing of actual jury prejudice unnecessary. For example, in his motion for judgment of acquittal or in the alternative for a new trial, appellant characterizes the publicity as "inflammatory." He fails to specify how the coverage was inflammatory or why it made an impartial jury impossible. The press clippings attached to the motion are meant to show that the publicity was prejudicial. We have examined all the clippings introduced and find them to be objective and free of passion or prejudice. Appellant also complains that the articles related the fact that the Bank of Pine Apple had suffered $2 million in losses and thereby implied that appellant had stolen that amount. Appellant does not allege that the articles accused him of stealing the money or otherwise misrep- resented the facts behind depositors' losses at the bank.

Although appellant claims that there was great community hostility toward him and that the press coverage was aggravated by rumors, he has at no time offered any proof in support of either of these allegations.

Finally, the press coverage was not inherently prejudicial because it mentioned related law suits arising out of the fall of the bank. See, e. g., Dosek v. United States, 405 F.2d 405 (8 Cir. 1968).

13. Appellant does not claim that evidence specifically ruled inadmissible at trial was printed or broadcast in the public media. See Marshall v. United States, *supra*. Nor is there any proof that the jurors read trial publicity during the time they sat on the panel.

spread publicity prior to and during trial, but it is not claimed that the publicity was of the highly prejudicial nature found in the *Sheppard* case, we think the accused must follow the traditional rule and show actual jury prejudice.[14] It is not enough to allege that there was extensive press coverage of the trial or the events preceding it, unless jury prejudice can be proved.

Although it is not necessary to the disposition of the case, we comment briefly on the various Alabama newspaper clippings introduced as evidence of prejudicial publicity. A careful examination of the clippings reveals them to be factual, accurate, and lacking in sensationalism. They are straightforward news accounts of the closing of the Bank of Pine Apple, attendant financial woes, and appellant's trial.

No belief that appellant is guilty pervades the articles; no editorials or cartoons denounce appellant; and there are no revelations of highly damaging allegations, as in the *Sheppard* case. None of the publicity introduced by appellant indicates that appellant was the victim of "a self-appointed vindictive or crusading news media." Welch v. United States, *supra*, 371 F.2d at 292.

■■■ Of course in analyzing the press output we are handicapped by the trial court's refusal to admit into evidence numerous other items of publicity. In different circumstances this refusal might have jeopardized seriously appellant's right to a fair trial.[15] Had appellant factually alleged that the publicity contained scurrilous items similar to those found in the *Sheppard* case, the trial court would have erred in excluding the proffered items. But since appellant has not alleged that the press coverage was of an inherently prejudicial nature, only that it was voluminous and saturating, we cannot presume that the excluded press articles contained matter which not even appellant claims them to have contained.

## REFUSAL TO PERMIT RE-CROSS EXAMINATION

On the morning of the second day of the trial, this colloquy occurred between the trial judge and counsel for appellant:

"THE COURT:

Now, wait a minute. We are going to follow the rules of evidence here. We are going to have direct, cross and re-direct and that is going to be it. Napoleon, thank you very much and you may go. We might send for you to come back later.

MR. PORTER:

Your Honor, we would like for the record to show this, if it please the Court.

THE COURT:

What is that?

MR. PORTER:

That we had further questions on re-cross examination.

THE COURT:

There is no such thing as re-cross examination.

MR. PORTER:

We would like to respectfully except.

\*　\*　\*　\*　\*　\*

THE COURT:

Mr. Garrett and Mr. Porter, evidently the understanding of rules of procedure may vary from Court to Court. My rule is, and I am going to adhere to it from now on out, and that is there is going to be direct, cross and redirect and that it unless there is something very special that needs to be brought out.

14. Cf. Gawne v. United States, *supra*; Williams v. Dutton, 400 F.2d 797 (5 Cir. 1968); Welch v. United States, *supra*. This is assuming that the accused, like the appellant here, was not subject to the television coverage condemned in *Estes* and *Rideau*.

15. When dealing with allegations by an accused that publicity has threatened the fairness of his pending trial, the best course for the trial judge would seem to be to admit all evidence relevant to this issue.

Evidently, you were not familiar with my rule. If you want to call the witness back, and if you really have something you want to ask this witness, I am going to let you ask him.

MR. PORTER:

Your Honor, we would respectfully like to except to the Court's ruling.

THE COURT:

If you want to ask him something, ask him.

MR. PORTER:

I mean, the rule you are laying down for the remainder of the trial, that there can be no recross, and we would like to respectfully except to that ruling."

Appellant complains that the trial judge in refusing to permit "re-cross examination" deprived him of his Sixth Amendment right to confront his accusers.

The admissibility in federal criminal proceedings is governed by Rule 26, Federal Rules of Criminal Procedure.[16] This rule contemplates a uniform law of evidence for the district courts; as a consequence, the criminal procedure of the state in which the district court is located is inapplicable. Burney v. United States, 339 F.2d 91 (5 Cir. 1964).[17] Apparently appellant had difficulty in comprehending the trial court's ruling because he believed that Alabama state criminal procedure should have been followed.[18]

When trying a criminal case a federal court has considerable discretion in permitting re-cross examination. Kitchen v. United States, 95 U.S.App. D.C. 277, 221 F.2d 832, 835 (1955). A party has a right to re-cross examina-

16. "In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an act of Congress or by these rules. The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

17. "This rule differs from the corresponding rule for civil cases Federal Rules of Civil Procedure, Rule 43(a), 28 U.S.C. in that this rule contemplates a uniform body of rules of evidence to govern in criminal trials in the Federal courts, while the rule for civil cases prescribes partial conformity to State Law and, therefore, results in a divergence as between various districts. Since in civil actions in which Federal jurisdiction is based on diversity of citizenship, the State substantive law governs the rights of the parties, uniformity of rules of evidence among different districts does not appear necessary. On the other hand, since all Federal crimes are statutory and all criminal prosecutions in the Federal courts are based on acts of Congress, uniform rules of evidence appear desirable if not essential in criminal cases, as otherwise the same facts under differing rules of evidence may lead to a conviction in one district and to an acquittal in another." Notes of Advisory Committee on Rules, Rule 26, 18 U.S. C.A., p. 202 (1969 ed.).

18. Thus appellant argues in his brief: "The law in Alabama today is that re-cross examination upon new matters which were brought out on re-direct examination or on matters in rebuttal must be allowed as a matter of right.
\* \* \* \* \*
Re-cross is also allowed as a matter of right when it is designed to test the credibility of the witness or the testimony elicited on re-direct. The Alabama case of Bank of Loretto v. Bobo [37 Ala.App. 139, 67 So.2d 77 (1953)], *supra*, properly admitted evidence on re-cross which bore on the credibility of the witnesses testimony on re-direct."
Appellant's confusion is perhaps related to the fact that Alabama follows the "English" rule of cross examination, which permits cross examination as to any of the issues in the case, while the federal courts follow the "Federal" rule, which limits cross examination to matters raised on direct examination. *Compare* Riddle v. Dorough, 279 Ala. 527, 187 So.2d 568 (1966); Madden v. State, 40 Ala.App. 271, 112 So.2d 796 (1959), cert. den. 269 Ala. 697, 112 So.2d 800; Streit v. Wilkerson, 186 Ala. 88, 65 So. 164 (1914) *with* United States v. Bender, 218 F.2d 869 (7 Cir. 1955) and Bell v. United States, 185 F.2d 302 (4 Cir. 1951).

tion only where new matter is brought out on re-direct examination.

"Where new evidence is opened up on redirect examination, the opposing party must be given the right of cross-examination on the new matter, but the privilege of recross-examination as to matters not covered on redirect examination lies within the trial court's discretion." United States v. Stoehr, 196 F.2d 276, 280 (3 Cir. 1952).

█ By comparing this passage with the words of the trial court quoted at the beginning of this section, it may be seen that the trial court incorrectly stated the rule of law to be applied with regard to re-cross examination. Despite this, we have not found any instance in the record where new matter was explored on redirect examination and appellant was denied an opportunity to re-cross examine. The trial court erroneously stated but correctly applied the law of re-cross examination.

Appellant cites four instances in which he was denied his right to re-cross examine.

*Witness J. E. Holley:*

Appellant contends that he was permitted to ask several questions of witness Holley on re-cross examination, that new matter was uncovered, but that the trial court prevented appellant from completing the examination.

The record shows that on re-cross examination counsel for appellant attempted to impeach witness Holley on the basis of Holley's statement to the F.B.I., pursuant to the Jencks Act, 18 U.S.C.A. § 3500. The record also shows that the trial court observed that this should have been done during cross examination, that counsel for appellant agreed but stated that he had just read the statement, and that the trial court announced that appellant would not be allowed to impeach on the basis of Jencks material on re-cross examination.[19]

19. *RE-CROSS EXAMINATION*
*BY MR. GARRETT:*

Q. Were you drunk at the time you signed these papers for Mr. Pitts?

A. I had drunk some the day before.

Q. You did. You did tell the F.B.I. that you were drunk?

A. I had been drinking the day before.

Q. Did you tell him you were drunk when Mr. Pitts brought the papers to you?

A. No, sir. I had been drinking the day before.

Q. Would it be true that he advised, in regard to this loan, that John Pitts, who lives near Midway, Alabama, and who has been associated with the Hales for a number of years, came by his, Holley's house, and Holley advised that he was drunk at the time Pitts got him to sign the paper. Did you tell the F.B.I. that?

A. I told him I wasn't at myself; no sir.

Q. You went in the Bank and signed the Security papers at the Bank?

A. I wasn't drunk then.

Q. You knew what you were signing then, too, didn't you?

A. No, sir.

Q. You knew what you were signing when you notified the State that you owed the money?

A. No, sir.

Q. You didn't know what you were signing when you signed that paper for the State of Alabama months later?

A. Oh, I know I didn't get the money.

Q. Do you know that you acknowledged to the State of Alabama that you got this money?

A. Well, I had got some of that stuff listed on the letter.

Q. Well, it had $39,500 on there and you signed it and sent it back.

A. There was some more.

Q. You read it all over, didn't you?

A. Not all of it.

THE COURT:
When did you get the Statement?

MR. GARRETT:
I just read it.

THE COURT:
Well, you should have brought all of this out on cross.

MR. GARRETT:
Well, I could have.

THE COURT:
Well, you could have asked me to wait and let you read it.

MR. GARRETT:
Well, if that is as far as I can go, I will stop.

THE COURT:
No, if you want to read the witness' statement before you cross examine him,

■ The trial court did not terminate the examination of witness Holley; appellant was simply prohibited from doing on re-cross examination what he should have done on cross-examination. Appellant did not propound further questions on other subjects, and there is nothing to indicate that he wished to re-cross as to any new matter which came out on re-direct examination. Indeed, appellant does not allege that he wished to re-cross examine as to new matter which had come out on re-direct examination, only that he wished to delve further into new matter which had come out on his re-cross examination. In view of all this, we do not think that the trial court abused its discretion when it barred appellant from using re-cross examination for purposes of Jencks Act impeachment.

*Witness Philip Winters:*

Appellant claims that the trial court erred when it refused to allow re-cross examination of witness Winters. This government witness was the subject of direct examination, cross examination, and re-direct examination. Following the latter, the trial court asked: "Who is your next witness?" There is nothing in the record to indicate that appellant had any desire to re-cross examine this witness. Appellant lodged no objection to the trial court's action. He made no proffer of the purpose or scope of any proposed re-cross examination.

■ The fundamental reason why appellant cannot claim error with regard to witness Winters is that he had no right to re-cross examine Winters. The re-direct examination had brought up no new matter. Since re-cross examination is a right only as to new matter brought out on re-direct examination, it was not error to refuse appellant opportunity to re-cross examine this witness.

*Witness Frank McGill:*

■ Appellant claims that he was denied the right to re-cross examine witness McGill. Appellant does not assert that he objected to this denial, or that he brought to the trial court's attention his desire to re-cross examine McGill. He does not assert that new matter had come out on re-direct examination. He made no proffer to the trial court of the purpose or scope of his proposed re-cross examination.

The record reveals that appellant did ask questions of McGill following the re-direct examination and that appellant then indicated to the trial court that he had no more questions.

The re-direct examination related to an assignment for certain stock certificates, prepared by McGill and signed by appellant. On re-direct McGill testified that he could not now find the assignment. Counsel for appellant then injected himself into the discussion by stating that the assignment was not to be found. The trial court added a few words. The government then indicated that it had no further questions, whereupon counsel for appellant did likewise.[20]

---

ask me and I will stop and let you do that.
MR. GARRETT:
I was at the rostrum questioning the witness and didn't have a chance.
THE COURT:
Look * * *
MR. GARRETT:
I'm sorry.
THE COURT:
You can bring out everything you want to bring out on cross examination and that is going to be it from now on.
MR. GARRETT:
We except.

20. *RE-DIRECT EXAMINATION BY MR. CONWAY:*
Q. Just one point, your Honor, if you don't mind. Mr. McGill, on those five stock certificates, the ones with Dr. Simmons and Duffee, that were not endorsed in blank, but were endorsed to E. B. Hale or the Bank of Pine Apple, where he crossed out E. B. Hale, what is it that gets it from Hale to Triple I, what endorsement or legal instrument or what transfer that gets these stock certificates out of E. B. Hale into Triple I on those five?

The trial court questioned McGill a bit more, and the witness was then excused.

*Witness L. J. Hale:*

Witness L. J. Hale was subjected to only a brief re-direct examination; half of the questions were asked by the trial judge rather than the government. The only information elicited on re-direct from this witness, who was obviously an uneducated man, related to whether Napoleon Hale had signed some papers one day at appellant's bank and whether there was writing in the middle of the paper that was signed. This information was not new.[21]

In this instance appellant did object to the denial of re-cross examination. However, he had no right to re-cross examine the witness.[22]

## FAILURE TO GRANT MOTION FOR ACQUITTAL

Appellant claims that the trial court erred in its failure to grant his motion for acquittal under Count 4 of Indictment 15,140. This count charged appellant with embezzling securities (issued to and endorsed in blank by Philip Winters) which had come into his care by virtue of his position as a bank official.

Appellant contends that there was absolutely no evidence that the securities had ever been given to him as President of the Bank of Pine Apple.[23]

A. On that particular day, I prepared an assignment of all of these certificates that were not endorsed in blank, but Mr. Hale signed it, but I cannot find it.
Q. Have you looked for it?
A. I have searched; yes, sir.
Q. Have you made a diligent effort to find it?
A. Yes, sir.
Q. Is it worded just like these other transfers?
MR. GARRETT:
Well, the thing itself would be the evidence of how it is worded.
MR. CONWAY:
We can't find it.
MR. GARRETT:
I know you can't find it. It is not there.
THE COURT:
Are you going to take the stand and testify?
MR. GARRETT:
No sir.
THE COURT:
Well, don't testify sitting there. Under the rules of evidence, if it cannot be found, he can testify.
A. It is a standard blank stock assignment, nothing printed on it.
MR. CONWAY:
That's all I have.
MR. GARRETT:
Do you have a copy of it?
A. No, sir.
MR. GARRETT:
That's all.
THE COURT:
Did any of this, after the Attorney General approved $4.50, was any of it sold at $4.50?

A. No, sir.
THE COURT:
Thank you Mr. McGill, You may be excused. Call your next witness.

21. On re-direct examination, witness L. J. Hale was asked who was listed as grantee on the papers signed in the bank, and this information, had it been obtained, would have been new. However, the question was never answered.

22. Despite the seeming inflexibility of its rule, the court did at times permit re-cross examination of some witnesses. Even assuming that the trial court had followed its own rule and allowed no re-cross examination whatever, it is difficult to see how this would have denied appellant the right to confront his accusers. Such action by the trial court would not have prevented appellant from confronting his accusers; it would only have affected the order of confrontation. All the witnesses were equally available to the appellant and could have been called to the witness stand by him and questioned on direct examination as to any point he desired.

The discretion of a trial court in assuring an orderly presentation of the evidence has long been recognized. United States v. Bender, *supra*.

23. Philip Winters testified on cross examination that he bought the Investments International, Inc. (hereinafter Triple I) securities from appellant while appellant was acting in an individual capacity. Appellant testified on direct examination that the securities were never in the custody of the bank and that they were given to him on a personal basis.

The testimony revealed that appellant approached different persons in the community, including Winters, with an invitation to purchase securities in Triple I. At the same time appellant agreed to arrange for a bank loan to finance the purchase.[24]

Philip Winters purchased his Triple I securities from appellant in June, 1964.[25] He paid for them by taking out a $10,000 loan from the Bank of Pine Apple, secured by timberland and some insurance. The loan was handled by appellant.

In late 1966 Winters decided to dispose of his Triple I securities. He took them to the bank, endorsed them in blank, and handed them over to appellant. Appellant was either to sell them or exchange them for Federated Investments securities on a two for one basis. Appellant sold Winter's Triple I securities but Winters denied ever having received the proceeds of the sale.

We think there was sufficient evidence introduced at trial for the jury to find that the Triple I securities had been intrusted to appellant as President of the Bank of Pine Apple.[26]

24. The following is from the government's cross examination of appellant:

Q. All right. Now, in each of these instances, I believe that these people purchased stock, did they not, the people that have been named here?
A. Yes.
Q. All right. And in each of these instances, at the time the stock was purchased, they signed a note, did they not?
A. I suppose that the dates would be about probably the same, yes.
Q. Yes. As a matter of fact, in the time you contacted these people to sell them stock you agreed to handle their note at the Pine Apple Bank, didn't you?
A. Yes, sir.
G. Now, you went out to see them as the stock broker?
A. No.
Q. In what capacity, Mr. Hale?
A. As an individual. The stock was not stock that was owned by the corporation.
Q. It was owned by Byron Hale, wasn't it?
A. No. It was owned by Virgil Hale.
Q. It was in his name?
A. Yes.
Q. But you came back having agreed, as President of the Bank, to make a loan to these people for the purpose of buying the stock; isn't that right?
A. Yes.
Q. All right, sir. And this is the case with respect to the persons I have just named, the Hornady's, Winter, Duffee, Simmons, and the rest?
A. Winters is the correct name on his.
Q. All right.

25. Philip Winters testified that he and appellant had been friends for most of their lives, that he had had a bank account at the Bank of Pine Apple for many years, and that appellant had been his banker.

26. There can be no doubt that Philip Winters dealt with appellant in his banking capacity when Winters borrowed the money with which to purchase the securities. That circumstantial evidence alone presented a jury question of the capacity in which Winters was dealing with appellant when Winters gave him the securities. The entire series of transactions between Winters and appellant would never have taken place if appellant had not offered to loan money to Winters. It strains credulity to believe that appellant dealt with Winters in a dual capacity— as friend when he proposed buying the securities, as bank president when he offered to loan money to purchase the securities. As the government remarked in its closing statement:

Now, there is another fascinating defense here that I must mention to you. It is called the two-hat doctoring. I believe he has asked the Court to charge you that Byron Hale, individually, and Byron Hale, as President of the Bank, are two different people, and Byron Hale, the President of the Bank, is on trial here. This is ingenious. It is fascinating. Do you know Byron Hale who told Cecil Hornady that he was selling the stock was not the same Byron Hale who told him he would send him the money to buy it with? Do you know that the Byron Hale who got those stock certificates and kept them all during the time that Cecil Hornady owned them is not the same Byron Hale who took them over to Opp and cashed them in for credit on his note? That is the two-hat doctrine you have been hearing so much about. I think this is fabulous.

We have considered appellant's other allegations of error and find them to be without merit.

Affirmed.

### ON PETITION FOR REHEARING AND PETITION FOR RE-HEARING EN BANC

**PER CURIAM:**

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

On direct examination Philip Winters was asked in what capacity he approached appellant with the request to dispose of the securities:

*MR. CONWAY:*
All right. Let me just ask you just one point blank question here.
Why did you give Bryon Hale your stock certificate? In what capacity did you give it to him? Why did you entrust your stock certificate to Byron Hale?
A. Well, I had no reason not to mistrust Byron Hale. We have been friends and I have done business practically all of our lives there at the Bank of Pine Apple and he has always been good to us. I didn't see any point of mistrusting him. Certainly that is the last thing you think about is mistrusting your bank president.