**UNITED STATES of America**

v.

**RIGGI, John M., Appellant in 90–5974.**

**UNITED STATES of America**

v.

**TIMPANI, Salvatore, Appellant in 90–5975.**

Nos. 90–5974, 90–5975.

United States Court of Appeals, Third Circuit.

Argued Aug. 12, 1991.

Decided Dec. 12, 1991.

Rehearing and Rehearing In Banc Denied Feb. 13, 1992.

Harvey Weissbard (argued), Weissbard & Wiewiorka, West Orange, N.J., for appellant John M. Riggi.

John P. McDonald (argued), McDonald, Rogers & Rizzolo, Somerville, N.J., for appellant Salvatore Timpani.

Alan L. Zegas, West Orange, N.J., of counsel to appellants.

Michael Chertoff, U.S. Atty., R. David Walk, Jr. (argued), Asst. U.S. Atty., Newark, N.J., for appellee.

Before COWEN, NYGAARD, Circuit Judges, and POLLAK, District Judge.[*]

## OPINION OF THE COURT

COWEN, Circuit Judge.

Defendants John M. Riggi, Sr. and Salvatore Timpani appeal their convictions on a variety of charges stemming from alleged connections with the Mafia. Riggi was charged in a thirty-three count indictment with racketeering and committing acts of extortion while serving as a labor union official and consultant. He was convicted on eight counts of the indictment, including violations of the Hobbs Act, 18 U.S.C. § 1951 (1988), and Taft–Hartley Act, 29 U.S.C. § 186(b) (1988). He was acquitted on the remaining counts, including charges under the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C.

§§ 1961 et seq. (1988), that he was the "acting boss" of the DeCavalcante crime family. Timpani was convicted on a single Hobbs Act extortion charge.

Riggi and Timpani challenge their convictions on several grounds. We find it necessary only to deal with the issue of the defendants' right to recross-examine witnesses following redirect examination by the government. Because the erroneous restriction of recross-examination resulted in a violation of defendants' rights under the Sixth Amendment, the convictions must be reversed and a new trial ordered.

### I.

Riggi and four others were tried in 1990 on charges arising from their alleged connection with the Mafia. Only Riggi and Timpani were convicted. Riggi was convicted of Taft–Hartley and Hobbs Acts violations based on his conduct in connection with four contractors: Crosby's Heating Service, Akron Construction Corp., Moser Brothers Mechanical Contractors, and J.P. Sasso Inc. Timpani was convicted of a Hobbs Act violation for his conduct in connection with Crosby's Heating Service. The following facts form the basis for these convictions.

### A. The Crosby Extortion.

Billy Crosby operated a construction contracting business. In 1980, Crosby hired a part-time mechanic, Charlie Alfano, who introduced Crosby to Timpani. Timpani would come by the workplace to visit Alfano and the two would talk about "getting work for Crosby." Crosby attended Alfano's wedding, where he met Riggi. Riggi told Crosby that he could get him a substantial amount of work, but that arrangements would have to be made through Timpani.

In late 1980, an "agreement" was reached pursuant to which Crosby would pay a five percent "commission" to Timpani and a ten percent "commission" to Riggi

[*] Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

for work directed to Crosby. Crosby was told to put Timpani on the payroll, which he did, although Timpani did not work regular hours. Crosby was indirectly threatened a number of times, leading him to believe that he could not disassociate himself from his new acquaintances without putting himself in jeopardy.

Crosby intermittently performed construction work on the homes of Riggi and his family without full, and in some cases any, compensation. The record indicates that Riggi and his associates slowly took control of Crosby's business. Although Crosby came to be accepted by Riggi, Alfano and Timpani, he was afraid of them. His fear was well founded: Timpani told him that once he was in with them, there was no getting out. The only way out, Timpani told Crosby, was to be dumped in the bay with his feet encased in concrete.

In 1982, at Riggi's direction, Crosby explored placing a bid on a contracting job. When one of the architects demanded a new Cadillac from Crosby, he went to the FBI and agreed to wear a recording device and have one installed in his office. The architect was not associated with Riggi or Timpani, but Crosby recorded his conversations with Riggi and Timpani as well. The resulting recordings corroborate Crosby's testimony that Riggi and Timpani dominated him. Crosby continued to make payoffs to Riggi and Timpani through 1985. Both Riggi and Timpani were convicted of extorting Crosby under the Hobbs Act, 18 U.S.C. §§ 1951, 1952.

## B. Akron Construction Company.

Leonard Teitel and Michael Castro formed Akron Construction Company as a general contractor to supplement their existing business, Autotron Electric. They consulted Riggi before forming the new business because they wanted to avoid labor problems. At Riggi's direction, Teitel and Castro made Joseph Merlo a full partner in Akron Construction, although neither of them knew Merlo previously. Merlo was paid a salary in connection with the only job Akron Construction performed, though Merlo's only work was to show up on the job site four or five times. The check paid to Merlo was endorsed to a pizzeria which Riggi's wife and Merlo's son owned.

Teitel also performed unpaid work for Riggi, his friends, and associates. Riggi was convicted of two counts of extortion in connection with these activities, under the Taft–Hartley Act, 29 U.S.C. § 186(b)(1), and the Hobbs Act, 18 U.S.C. § 2 (1988).

## C. Moser Brothers Mechanical Contractors.

Moser Brothers used Riggi's influence to obtain a sweetheart contract. The principal benefit of this arrangement was that Moser was able to use nonunion laborers for $5.50 an hour, instead of the prevailing wage of $12.50 an hour. Riggi was videotaped accepting a payment from Moser, and convicted of extortion under the Hobbs Act, 18 U.S.C. § 2, and Taft–Hartley Act, 29 U.S.C. § 186(b)(1).

## D. J.P. Sasso, Inc.

J.P. Sasso, Inc. was a construction contractor that employed members of Riggi's local union. Although Riggi did not formally own any interest in Sasso, conversations recorded at a cafe frequented by Riggi reveal that he was truly in control of the business. Riggi made it clear to Sasso that Riggi was in control: "From now on anything you do, comes through me." App. at 713.

The fact that Riggi was extorting Sasso can be inferred from several other facts. Over a period of time, Sasso's ostensible owner, Joseph Sasso, made large and unexplained gifts to Riggi's daughter and son-in-law. In addition, Sasso inexplicably assigned valuable interests in various partnerships to Riggi's daughter and son-in-law. Riggi was convicted of extortion in connection with these transactions under the Hobbs Act, 18 U.S.C. § 2, and Taft–Hartley Act, 29 U.S.C. § 186(b)(1).

## II.

The trial in this matter began on May 21, 1990, and lasted approximately eight

weeks. At trial, the district court announced a blanket rule that there would be no recross-examination. Defendants objected vigorously. Over time and after continued protest, the district court relented, little by little, until it eventually lifted its absolute bar. The district court eventually permitted limited recross upon request and, even then, subject only to offers of proof. Such limited cross-examination as the district court permitted did not occur, however, until after thirteen witnesses were examined on redirect without further recross.

One of these thirteen, Ronald Fino, was a key witness for the prosecution whose testimony on redirect examination may have been dispositive on some counts. Fino was a significant government witness who, on redirect examination, gave new and damaging testimony against appellant Riggi. Fino was one of only two witnesses who gave testimony directly supporting the government's thesis, which pervaded the indictment, that Riggi was "acting boss of the DeCavalcante crime family." App. at 1006. Fino's testimony to that effect came out for the first time on redirect examination. Although some organized crime affiliation by Riggi could be gleaned from Fino's testimony on direct examination, his testimony could have been interpreted to mean that Riggi was simply a union leader under the control of organized crime.

Two new matters arose on redirect examination of Fino which were not permitted by the district court to be subjected to recross. First, Fino referred to "suffering" he experienced as a result of disassociating himself from organized crime and cooperating with the FBI. Second, he specifically identified Riggi as the "boss or the acting boss of the DeCavalcante family." Defense counsel were barred from recrossing Fino in both areas.

The first new matter arose on redirect examination in the following manner:

Q. Mr. Fino, do you remember on cross-examination saying something to the effect that you feel that you're currently suffering? Do you remember using that word, "suffering"?

A. Yes, I do.

Q. What did you mean by that?

A. Well, I lost everything I had. I lost my family, I lost my normal way of life. I cannot function as a normal human being any more. I cannot go into cities, I cannot go to ball games. There's things I just cannot do.

App. at 1002.

The second, and more important "new" area opened on redirect was:

Q. Do you recall on cross-examination you said that you had described John M. Riggi as a quiet and humble man? Do you recall those words?

A. Yes, I do.

Q. In fact, during the time when you knew John M. Riggi, were you aware of John M. Riggi's position in organized crime?

A. Yes, I was.

Q. How were you aware of John M. Riggi's position in organized crime?

A. I don't know how at first I became aware of it. Probably my father or Sam Pieri. But I was always aware. In fact, I was aware, you know, of his achieving a higher rank when it happened. I was told that, too.

Q. A higher rank in what?

A. In La Cosa Nostra.

Q. And when you say your father or Sam Pieri, what conversations are you referring to?

A. We had—I had conversations with my father and Sam Pieri on numerous occasions over organized crime in the country, Buffalo, other areas, who was part of it.

Q. Was John M. Riggi discussed?

A. Yes, he was.

Q. What were you told about John M. Riggi?

A. At first, I was told when he was just a soldier or a capo, I don't recall which one, but he wasn't boss then.

Q. And then were you later told something different?

A. Yes, I was.

Q. What was that?

A. That he was the boss or the acting boss of the DeCavalcante family.

App. at 1005–06.

Defense counsel urged the court to reconsider its policy against recross-examination. They indicated that Fino's "suffering" could be effectively impeached with information that Fino lost his family not because of his cooperation, but rather because he was having an affair and had failed to properly support his children. Likewise, counsel argued that Fino's statement about Riggi's position in organized crime should not go unchallenged. The court repeated that redirect examination would be permitted but that recross-examination would not. App. at 1013–24.

The only other witness to give direct testimony concerning Riggi's alleged ties to organized crime, Jesse Hyman, admitted to having committed perjury, had been convicted of numerous criminal offenses over a period of years, and had only recently decided to cooperate after having been sentenced to a lengthy prison term. Hyman was impeached thoroughly, and it is problematic whether his testimony standing alone carried substantial weight for the jury. Fino, in contrast, was clean cut and college-educated. He had no organized crime acquaintances except through his father. He cooperated with the FBI almost since the time he took union office, had no criminal record, and appeared as a reliable and believable witness. Fino claimed to be cooperating and testifying "out of conscience" and a desire to "do the right thing." App. at 1004. The district court did not permit defense counsel to recross-examine either witness.

In addition, the court's policy regarding recross examination was unclear until it was challenged by counsel immediately following Fino's redirect examination. The following colloquy between the court and counsel took place outside the presence of the jury:

> Defense Counsel: Judge, I don't know if I understand your policy. Is that that there will be absolutely no recross for this trial?

> The Court: That's correct, Government or—both sides. It's going to work the same way.

> Counsel: Well, then, no redirect?

> The Court: Oh, no. Oh, no. They're permitted to have redirect.

> Counsel: But we're not permitted to have recross.

> The Court: No, listen to what I'm saying Mr. McDonald. Don't look down and look away. You asked me a question, and you said, they're allowed to have it and we're not. That's an attitudinal problem that I don't want to deal with in this case.

> Counsel: No, I want to get the rules straight.

> The Court: I want to deal fairly with you. All right? If you should put a witness on your side of the case and you engage in direct, and then they cross, you will be entitled to redirect in the same fashion.

> Counsel: I want to make sure I know the rules. There's no recross at all.

> The Court: *There's no recross at all.*

> Counsel: Judge, what about, though—

> The Court: In other words, they engage in direct. You cross. Redirect is only to go into the matters raised on cross. Now, if Mr. Ruotolo is correct, which I don't agree with, and I'll comment, but if Mr. Ruotolo were correct, that matters were raised on redirect that were not part of cross, you should have objected, and I would have sustained your objection.
>
> So it will not occur, Mr. Ruotolo, that matters will be raised on redirect that were not part of the cross, because virgin matter should not be raised on redirect, and if it happened, you should have objected, and I would have sustained your objection.
>
> Ms. Waldor objected as to minorities and awards, and I sustained her objection.

> Counsel: I understand that, but I agree with Mr. Ruotolo that, if I remember the colloquy, it went something like this. Mr. McCarthy said, do you remember the questions about Ms. Wal-

dor that John Riggi was a humble and quiet man or something along that line? Yes. And then the next question is, well, what do you know about him, and it's like, *he's the head of an organized crime family.* You know, Judge, if that's the way it happened, would you sustain an objection there?

The Court: Absolutely. I would have sustained the objection.

Counsel: Well, I respectfully submit, Judge, that *we didn't really have the benefit of your rules at that time.*

The Court: *You now know.*

Counsel: Well, now know—the horse is out of the barn.

App. at 1015–17 (emphasis added). Obviously the district court did not formally put counsel on notice of its policy until it was too late for defense counsel to object to the government's questioning of Fino on redirect. Defense counsel were proceeding under normal and expected court trial practice methods, and it was impossible for them to have anticipated the change of the rules by the district court.

Counsel: But I suggest to you, I never believed I waived my right to either recross or to object to where redirect was—

The Court: I didn't say you waived it. We didn't get into the question of waiver.

Counsel: I know, but because I did not perceive this Court's policy, in fact, I've waived my right to cut off the redirect by not objecting here because I presumed I have the opportunity to come back on recross.

The Court: I will hold the government to a strict redirect within the matters raised on cross, and *they're now on notice.* And you're on notice. Just as I am not going to permit recross by you, because recross, Mr. Ruotolo, despite your representation, it has nothing to do with you as an individual, recross in a trial such as this becomes an abuse.

Counsel: I recognize it can, Your Honor, and that's why you're here.

App. at 1019 (emphasis added).

Riggi and Timpani challenge their convictions on several grounds. First, they claim that the district court improperly restricted all recross-examination, depriving them of their rights under the Sixth Amendment Confrontation Clause. In addition, Riggi asserts that the prosecutor's rebuttal summation improperly suggested that Riggi committed crimes not charged in the indictment; the evidence was insufficient to convict; the government improperly amended the indictment; a violation of the sealing requirement of 18 U.S.C. § 2518(8)(a) required suppression of all evidence obtained by electronic surveillance; the district court improperly dismissed a juror for cause; evidence was obtained through illegal wiretaps; and the district court improperly refused to conduct a hearing into allegations that a juror was incompetent. Timpani joins these arguments as they apply to him. Because of our disposition on the issue dealing with the unwarranted cutting off and limitation of recross-examination after new matters were raised on redirect examination, we need not reach these other issues raised by defendants.

### III.

Riggi and Timpani claim they were denied their constitutional right to confront witnesses against them because, while the district court permitted redirect examination, it announced, and for a substantial portion of the trial maintained in force, a rule that absolutely forbade any recross-examination. Their claim is based on the Sixth Amendment Confrontation Clause.[1]

As a general rule, a trial court has wide discretion to restrict recross-examination, especially when no new matters have been raised on redirect. *See Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931); *United States v. Rockwell,* 781 F.2d 985, 988 (3d

---

**1.** The Sixth Amendment Confrontation Clause states in pertinent part that "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.

Cir.1986); *United States v. Kenny*, 462 F.2d 1205, 1226 (3d Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). The conduct of a trial and the orderly presentation of testimony are committed to the sound discretion of the trial judge, and will not be disturbed on appeal absent a showing of abuse of discretion. A trial court has considerable discretion in permitting recross-examination, *see Hale v. United States*, 435 F.2d 737, 749 (5th Cir. 1970), *cert. denied*, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971), and all restrictions on the presentation of testimony are generally entrusted to the discretion of the trial court. *See, e.g., United States v. Adams*, 759 F.2d 1099 (3d Cir.), *cert. denied*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985), *Stich v. United States*, 730 F.2d 115, 117 (3d Cir.), *cert. denied*, 469 U.S. 917, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984); *Virgin Islands v. Blyden*, 626 F.2d 310, 313 (3d Cir.1980).

■ The Federal Rules of Evidence do not directly address redirect or recross-examination. Rule 611(b) provides that the scope of

> [c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

Fed.R.Evid. 611(b). The trial court may permit inquiry into new matters on cross-examination when to do so will illuminate material issues or clarify areas of confusion. 7 John H. Wigmore, *Evidence* § 1889 (James H. Chadbourn rev. ed. 1978). Conversely, the court may limit inquiry into new matters on cross-examination when the result of introducing new matters would be confusion, complication, or protraction of the case. *Id.* § 1885. The exercise of the court's discretion necessarily operates not as a hard and fast rule, but according to the actual development of the case. *Id.* § 1886.

■ The tradition in the federal courts has been to limit the scope of redirect examination to the subject matter brought out on cross-examination. *See, e.g., United States v. Morris*, 485 F.2d 1385, 1387 (5th Cir.1973); *Hale*, 435 F.2d at 749–50. Ideally, no new material should be presented on redirect, because litigants will in theory have presented all pertinent issues during the direct examination. *Id.* In reality, however, new information may come out on redirect, when the trial court, in its discretion and in the interest of justice, determines that the information is relevant and admissible.

■ In the case before us, by reason of the district court's policy forbidding recross-examination, new information elicited on redirect examination was not subjected to recross-examination by defense counsel. When material new matters are brought out on redirect examination, the Confrontation Clause of the Sixth Amendment mandates that the opposing party be given the right of recross-examination on those new matters. *Hale*, 435 F.2d at 752 n. 22.

The district court erred in imposing its blanket prohibition on recross-examination. It is well settled that if a new subject is raised in redirect examination, the district court must allow the new matter to be subject to recross-examination.

> Where new evidence is opened up on redirect examination, the opposing party must be given the right of cross-examination on the new matter, but the privilege of recross-examination as to matters not covered on redirect examination lies within the trial court's discretion.

*United States v. Stoehr*, 196 F.2d 276, 280 (3d Cir.), *cert. denied*, 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952).

Recross is to redirect as cross-examination is to direct. To allow redirect examination on new material but deny recross on the same material is to violate both the Confrontation Clause and fundamental principles of fairness. It is well established that the Sixth Amendment Confrontation Clause encompasses the fundamental right of cross-examination. *See, e.g., Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956 (1968); *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965);

*Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965).

■ Cross-examination is the principal means by which the trustworthiness of a witness is tested. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). So essential is cross-examination to this purpose that the absence of proper confrontation "calls into question the ultimate integrity of the fact-finding process." *Ohio v. Roberts,* 448 U.S. 56, 64, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980). *See also United States v. Segal,* 534 F.2d 578, 582 (3d Cir.1976) ("[I]f a matter has been raised on direct examination, generally cross-examination must be permitted.").

The principles underlying the right of cross-examination apply with equal strength to recross-examination when new matter is brought out on redirect. "Where, as here, new matter is brought out on redirect examination, the defendant's first opportunity to test the truthfulness, accuracy, and completeness of that testimony is on recross examination. To deny recross-examination on matter first drawn out on redirect is to deny the defendant the right of any cross-examination as to that new matter. The prejudice of the denial cannot be doubted." *United States v. Caudle,* 606 F.2d 451, 458 (4th Cir.1979) (citations omitted).

The reversible error in this case was the district court's absolute ban on recross-examination, an error which the court itself eventually recognized and ameliorated before testimony was completed. Defense counsel were given insufficient notice that strenuous objections should be made to any new matter brought out on redirect, and had no opportunity to cross examine Fino regarding that new matter. The Sixth Amendment guarantees the opportunity for effective cross-examination. *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985). This opportunity was denied.

■ The denial of cross-examination upon a proper subject for cross-examina-

tion is a ground for reversal if the denial appears to have been harmful. *United States v. Honneus,* 508 F.2d 566, 572 (1st Cir.1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). Whether the denial appears to have been harmful depends on the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* These principles apply equally to recross-examination.

■ In order to avoid reversal, therefore, the government must show that the violation of defendants' confrontation rights was harmless beyond reasonable doubt. *See Van Arsdall,* 475 U.S. at 681, 106 S.Ct. at 1436. The government has failed to meet its burden in this case. Ronald Fino was a key witness for the prosecution, clean cut, college educated, and far more difficult to impeach than any other witnesses for the prosecution. It was important to the defense to neutralize Fino's testimony, if at all possible, on recross-examination. This point was stressed before the district court, but to no avail. Fino was the more credible of the two main witnesses and, if believed, not only damaged Riggi directly but provided corroboration for Hyman and thereby enhanced his credibility. The prejudice to the defendant need not be "outcome determinative" in order to state a violation of the Confrontation Clause. *Id.* at 680, 106 S.Ct. at 1435. In this case it is clear that the absolute restriction on Fino's recross-examination could have dealt a devastating blow to the defense.[2]

---

**2.** Judge Nygaard asserts, dissent at 1378, that

Riggi's affiliation with organized crime was

The government argues that defendants failed to preserve their claims for appeal because they made no offer of proof in the face of the district court's absolute ruling. Under the circumstances of this case, we can only conclude that defense counsel were reasonable in considering it·futile, and indeed possibly harmful to their case, to make repeated offers of proof despite the district court's clear and unequivocal policy against permitting recross-examination. A tactical decision not to risk alienating the trial court and jury by repeatedly challenging the court's policy in the face of the district court's blanket rule did not constitute waiver in this case. *See Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966). If recross-examination is denied improperly, it is the government's burden to establish harmlessness, even in the absence of an offer of proof. *See Honneus*, 508 F.2d at 572.

Furthermore, the government's position that defendants had to make an offer of proof on each occasion that the right to recross was denied does not accord with the reality of courtroom dynamics. To require repeated offers of proof, aside from insisting upon a futile act in the face of the district court's ruling, would require counsel to risk alienating the district judge and, most important of all, risk casting the defendants in a combative and adverse light before the jury. As appellate judges, we must be mindful of the optics of our ruling in a trial court setting. Although defense counsel made no proffer as to exactly what testimony would be elicited on recross, this did not vitiate defendants' right to conduct recross-examination. The right having been erroneously denied, the burden is upon the government to establish that the denial was harmless beyond a reasonable doubt. Defendants need not show that the recross-examination, if allowed, would necessarily have brought out facts tending to discredit the witness. *Van Arsdall*, 475 U.S. at 679–680, 106 S.Ct. at 1435–36.

Riggi's acquittal on the RICO charges cannot be said to have rendered the error harmless. There could be many reasons for a RICO acquittal consistent with an acceptance of Riggi as organized crime boss. The jury may have believed Riggi to be who the government said he was. If he were thought to be what the indictment alleged, and what Fino and Hyman claimed, the prejudice to Riggi on all counts cannot be reasonably denied. Indeed, if the jury believed the testimony of Fino and Hyman, a guilty verdict was almost, as a practical matter, a foregone conclusion.[3]

Timpani's close association with Riggi was clearly established by the testimony regarding the Crosby extortion. Impeach-

clear from Fino's testimony on direct examination. That testimony established that Riggi held a high position in the labor union because of his ties to organized crime, Fino's father was acting boss of the Buffalo crime family, and Fino sought Riggi's support so Fino could be vice-president/regional manager of the Laborer's International Union. But Mafia connections and a high position in a labor union do not a crime boss make. Fino himself had extensive Mafia connections and an influential union position, but was not an organized crime figure, as the government clearly established. Riggi's position was not definitely established until Fino made it explicit.

**3.** Judge Nygaard asserts, dissent, *infra* at 1380, that the testimony regarding Riggi's position as boss of the DeCavalcante crime family was immaterial to the offenses for which he and Timpani were convicted. To the contrary, Riggi's position was clearly material to the Hobbs Act charges that the defendants affected commerce by obtaining property in the form of earnings and services, with consent, but which consent was induced by the wrongful use of threatened force and violence and fear of economic harm. *See* 18 U.S.C. § 1951. The jury's perception of the defendant's ability to intimidate and extort would clearly be affected by evidence of Riggi's position within organized crime. The testimony was material to the Taft–Hartley Act charges that Riggi did request, demand, receive and accept money and other things of value under circumstances where Riggi was a union officer in an industry affecting commerce, and the money was paid and delivered with intent to influence Riggi with respect to his actions, decisions and duties as an officer of a labor union. *See* 29 U.S.C. § 186. Again, the jury would be reasonably expected to perceive that Riggi's ability to extort money using his position as a union officer was enhanced if he was "acting boss." Riggi's position in organized crime directly related to his sphere and degree of influence, and cannot be said to be immaterial to these offenses.

ment of witnesses against Riggi would unquestionably have affected the jury's impression of Timpani. Under the circumstances of this case, Timpani had a right to recross-examine witnesses against his close associate, Riggi. *See* 3A John H. Wigmore, *Evidence* § 911 (James H. Chadbourn rev. ed. 1970). Recross by Timpani was prohibited under the blanket ruling of the district court. If recross had been allowed and Fino been impeached, the jury might have rejected Fino's testimony and, if they had, viewed both Riggi and Timpani differently.

## IV.

New information was introduced on redirect examination which the district court did not allow defendants to explore on recross-examination. Imposing this restriction was inappropriate because it was contrary to precedent, violated defendants' Sixth Amendment confrontation rights and operated contrary to the traditional application of the Federal Rules of Evidence. The ruling by the district court barring recross when new matter was elicited on redirect examination limited defendants' ability to present a defense. We will reverse the judgments of conviction and remand for a new trial.

NYGAARD, Circuit Judge, dissenting.

I dissent because the restriction of recross examination comports with the Confrontation Clause of the Sixth Amendment. The most "damaging" evidence from Ronald Fino's testimony on redirect examination was not new, so the district court had discretion to prohibit recross. And even if the court erred by imposing the prohibition, the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

Where new evidence is raised on redirect examination, the trial court must give the opposing party an opportunity to cross ex-

amine on the new matter. *United States v. Stoehr,* 196 F.2d 276, 280 (3d Cir.1952). Otherwise the privilege of recross examination lies within the sound discretion of the court. 196 F.2d at 280. Riggi and Timpani argue that Fino's redirect raised several new matters. Of these, the most "damaging" is the testimony that Riggi was the "boss or the acting boss of the DeCavalcante family." [1] App. 1006.

For all practical purposes, this testimony is not a new matter. The issue of Riggi's affiliation with organized crime had been raised in the direct examinations of both Fino and Jesse Hyman. The overwhelming inference to be drawn from Fino's direct testimony is that: Riggi was a prominent mobster with connections to the New York, Buffalo, and Cleveland Mafia organizations.

Discussions of the mob and Riggi's role and influence in the Mafia permeated Fino's direct examination. For example, in describing the manner in which Mafia members introduced others, Fino testified on direct:

Q. How did Sam Pieri introduce John M. Riggi to you?

A. He told John Riggi that my father was a friend of theirs, or a friend of ours, and that I was his son, a relative of a friend.

Q. What did that mean?

A. That meant that my father was a made man. It was how *they* would talk to each other, introduce people, made people, or—

App. 901 (emphasis added). Fino testified earlier that Sam Pieri was a capo in the Buffalo mob and that his father was "a soldier, became a capo, and eventually the acting boss of the Buffalo family." App. 900, 870.

Fino also testified that Riggi was the "president for the Northern New Jersey Mason Tenders" and that he "was [the business manager] for Local 394." App. 883, 886. When asked how persons obtain

---

**1.** Fino also testified on redirect that he was "suffering" because of his cooperation with the government. As the court's opinion notes, this matter is not as important as Fino's testimony concerning Riggi's status. Prohibiting recross on this matter is harmless error.

such positions, Fino testified, "Usually through who they knew, organized crime people.... They would decide who became members of the union." App. 890.

In a crucial exchange, Fino directly implicated Riggi as a organized crime figure. Fino testified:

Q. What was the purpose of your meeting with John Riggi?

A. Joseph Todaro, Jr. wanted me to see John Riggi to get his support for me because the Buffalo family wanted me to be the next vice president-regional manager.

Q. The Buffalo family wanted you to take the position of Mike Lorello as vice president-regional manager?

A. That is correct, yes.

Q. And what was the purpose of meeting with John Riggi for that?

A. *To gain his support* and to let him know of others that supported me.

\* \* \* \* \* \*

Q. What was discussed?

A. I discussed that, Joseph Todaro wanted me to see you for your [Riggi's] support, and that Chicago, the family in Chicago was supporting me, and Arthur Coia in New England was supporting me and family up there, and then I also had support of Cleveland and Buffalo, Buffalo supporting me.

Q. When you say, for instance, the support of Cleveland and Buffalo, what support were you referring to?

A. *Organized crime support.* The families.

Q. And what was Joseph Todaro, Jr.'s position at that time?

A. He was the underboss in the Buffalo family.

Q. What did John Riggi have to say about that?

A. Well, *he told me he would support me,* but that he went on to express that those areas didn't have any say-so on what takes place in New York and New Jersey, that that's controlled by the families over here, and that Cleveland and those families already have to answer down here anyway....

He told me that "even though people, those guys look at me"—I don't know if these were the exact words, words to this effect, "even though those people look at me as a *boss,* and I have to answer, too," and he made the gesture over to New York City and winched his chin a little bit.

\* \* \* \* \* \*

Q. What did it [motion to chin] mean?

A. That was a motion that was given when we were talking about a powerful Mafia figure in the Genovese family.

App. 915–18 (emphasis added and quotation marks added for clarity). This testimony shows that Riggi is a mob boss, that he "supports" Fino's bid for a new union position, and that even he has to answer to the New York Mafia. True, Fino did not say this as succinctly or plainly as he did on redirect, but he did say it.

The district court did not make its "no-recross" policy clear to counsel until after Fino's redirect, but this does not change the fact that Riggi had a chance to cross examine on the issue. Although Fino's testimony clearly implicated Riggi as a mobster, the defense chose not to squarely confront Fino on the issue. Instead they chose to impeach Fino by trying to show bias. The only foray into Riggi's character or status was this question, "And do you remember commenting that my client was a quiet and humble man?" Fino answered, "Yes, that's correct, I remember saying that. He is." App. 967. The Confrontation Clause is not violated when defense counsel does not take, whether by design or neglect, an opportunity to cross examine on points he considered prejudicial to his client. *See United States v. Howard,* 751 F.2d 336, 338 (10th Cir.1984) (no violation of confrontation right when defendant declined for tactical reasons to cross examine).

Fino's testimony on redirect was not to raise a new matter, but ostensibly to clarify the potential contradiction raised on cross examination.

Q. Do you recall on cross-examination you said that you had described John

M. Riggi as a quiet and humble man? Do you recall those words?

A. Yes, I do.

Q. In fact, during the time when you knew John M. Riggi, were you aware of John M. Riggi's position in organized crime?

A. Yes, I was.

App. 1005. The testimony was elicited to rebut defendants' attempt to impeach what was already said and to prevent jury confusion.

Aside from Fino, Hyman also testified to Riggi's status in organized crime. He testified on direct, "Sam DeCavalcante was the boss of the [crime] family and that John Riggi was his underboss." App. 1136. Thus Riggi and Timpani had at least two opportunities to cross examine assertions that Riggi was the "acting boss of the DeCavalcante family." The Confrontation Clause of the Sixth Amendment guarantees an *"opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original). The district court did not abuse its discretion when it refused to give the defendants another opportunity to challenge the witnesses. *See Kinzli v. City of Santa Cruz*, 818 F.2d 1449 (9th Cir.1987) (no violation of confrontation right when defense counsel was afforded more than an adequate opportunity to cross examine), *modified on other grounds* 830 F.2d 968.

But even if the district court erred, it was harmless because Fino's testimony on redirect was immaterial to the offenses for which Riggi and Timpani were convicted, was corroborated by Hyman's testimony, and was cumulative. In *Delaware v. Van Arsdall*, the Court said that upon finding error a reviewing court must consider "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." 106 S.Ct. at 1438.

The Court then set forth several factors to consider: "These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was *cumulative,* the presence or absence of evidence *corroborating or contradicting the testimony of the witness on material points,* the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." 106 S.Ct. at 1438 (emphasis added). Because recross is to redirect as cross is to direct, these factors apply equally to recross examination.

First, Fino was an important witness for the prosecution. But his testimony on redirect is immaterial to whether Riggi or Timpani violated the Hobbs or Taft–Hartley Acts.[2] Although that testimony was material, in fact crucial, to the RICO charges, both Riggi and Timpani were acquitted of those charges. Under the Hobbs Act, the "ability to intimidate" is not an element or a consideration as the majority argues. Maj. op. p. 1377, fn. 3. The Hobbs Act makes a threat a crime in and of itself regardless of whether it was viable. Moreover, the Taft–Hartley Act says absolutely nothing about violence; the illegality is requesting the money. Riggi and Timpani made threats to various people. That is clear. This testimony was immaterial. They violated the Taft–Hartley Act, and were properly convicted of it. In other words, the testimony does not go to prove any element of the charges of which Riggi and Timpani were found guilty. It simply was not a "material point."

Second, Fino's testimony is cumulative. Hyman gave the same testimony on his

---

**2.** Riggi was convicted for violating the Hobbs Act, 18 U.S.C. § 1951, and Taft–Hartley Act, 29 U.S.C. § 186(b). Timpani was convicted for violating the Hobbs Act. The Hobbs Act, § 1951 provides:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any articles or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in further-

ance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

The Taft–Hartley Act, § 186(b), provides:

It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

direct examination: "Sam DeCavalcante was the boss of the [crime] family and that John Riggi was his underboss." He testified in great detail as to his involvement with organized crime, his relationship with members of various crime gangs, and the relationship among their members, including the status of Riggi in the DeCavalcante organization. The defendants had ample opportunities to cross examine Hyman on these matters.

Third, that Hyman was "impeached" by evidence of bias is irrelevant because Fino corroborated much of his testimony on *direct* examination. Hyman testified that he was deeply involved in business dealings with mobsters, including Riggi. Fino corroborated this testimony:

Q. Do you know of a relationship between Jesse Hyman and the Defendant, John M. Riggi?

A. Yes, I do.

Q. How did you know about that?

A. From Sam Pieri.

Q. Who was Sam Pieri?

A. Sam Pieri was a capo in the Buffalo family.

Q. What did Sam Pieri tell you about Jesse Hyman and John Riggi?

A. That he made arrangements through John Riggi to set up dental clinic—or a dental clinic in the New Jersey area.

App. 896–97. And Fino also corroborated Hyman's testimony concerning Riggi's connections to the Mafia. His testimony did not portray Riggi as one controlled or intimidated by organized crime; it portrayed Riggi as controlling it. Riggi was in charge; he made the deals; he influenced those around him; and he called the shots. For example, Fino testified on direct:

Q. Was there any discussion by John M. Riggi about the position of John Corsentino as his successor?

A. We talked about communications in the future once John retired, but John indicated to me he would still be calling the shots. He could still be calling the shots to go to John Corsentino on future things to help him out.

Q. But John Riggi would still be calling the shots on the local [union]?

A. Yes. Again, I don't know if those are the right words, but words that meant that.

Even without his testimony on redirect, Fino corroborated much of Hyman's testimony on direct. As the court's opinion notes, Fino was a "reliable and believable witness."

Given Fino's testimony on direct, that Riggi was "the acting boss of the DeCavalcante family" was not new testimony. It merely summarized in one sentence what was said on direct, and it corroborated what Hyman said on direct. The majority concludes that the reversible error in this case was "the district court's absolute ban on recross examination ...," Maj. op. at 1376, but a bad, or even an erroneous, trial policy does not become reversible error until there is prejudice. Riggi did not receive a perfect trial, but he received a fair one. My position is that there was no prejudice because Riggi had his chance. Moreover, because Fino's testimony on redirect was immaterial, corroborated, and cumulative, and the error, if any, was harmless beyond a reasonable doubt, I would affirm.

### SUR PETITION FOR REHEARING
#### Feb. 13, 1992.

BEFORE: SLOVITER, Chief Judge; BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, and ROTH, Circuit Judges; and POLLAK, District Judge.*

The petition for rehearing filed by appellee having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

---

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, as to panel rehearing.