## STATE OF CONNECTICUT *v.* DAN L. MOORE
## (AC 26736)

Flynn, C. J., and DiPentima and Berdon, Js.

Argued February 14—officially released July 31, 2007

1

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Edward R. Narus*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BERDON, J. The defendant, Dan L. Moore, appeals from the judgment of conviction, rendered after a jury trial, of three counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), four counts of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (4), and one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (4). During trial, one of the state's witnesses, James Brooks, a coconspirator in the robbery, altered his testimony during cross-examination, absolving the defendant and, during redirect examination by the state, invoked his fifth amendment protections, refusing to testify further.[1] The defendant

---

[1] The defendant claims that Brooks improperly was allowed to invoke the fifth amendment protections against self-incrimination. We will not review this claim because the defendant did not raise the issue at trial. We will assume, without deciding, that the fifth amendment was invoked properly and proceed directly to the defendant's sixth amendment claim. See *State* v. *Roma*, 199 Conn. 110, 116, 505 A.2d 717 (1986).

claims that the court improperly denied his motion to strike testimony elicited by the state during the redirect examination of Brooks. We agree with the defendant and reverse the judgment of the court.[2]

The defendant was charged in connection with a robbery that occurred on October 6, 2002, in Windsor. A group of seven individuals was in or near their cars in the parking lot of the Ranch House restaurant when a dark blue minivan was driven adjacent to them. Several men got out of the van,[3] and the driver, Corey Wallace, remained inside the van. One of the men, Brooks, pointed a shotgun at the group while another, Andrew Cromwell, searched them. One witness testified that a third person stood near the van and told the victims to cooperate. After all seven individuals were searched, the men got back inside the van, threw two of the victims' wallets out a window and drove away. In total, approximately $30, a silver necklace and a cellular telephone were stolen.

The victims immediately called 911 to report the robbery and the license plate number of the van. Shortly after the robbery was reported, a Hartford police officer saw the van as it stopped near Main and Sanford streets in Hartford. The driver, Wallace, ignored police efforts to stop the van, instead leading police from four different police departments on a high speed chase until the van eventually was brought to a stop on Interstate 84.[4] Brooks, Cromwell, Wallace and the defendant were detained and arrested.

Later that night at the Windsor police station, the seven victims viewed photographic arrays containing

---

[2] Accordingly, because our conclusion on this issue is dispositive, we need not address the defendant's additional claims regarding prosecutorial impropriety and failure to instruct the jury on accomplice testimony.

[3] Testimony varied, but anywhere from two to four men got out of the van.

[4] The police used "stop sticks," devices that punctured one of the van's tires.

photographs of Brooks, Wallace, Cromwell and the defendant. Three victims identified Brooks as the gunman. One victim identified Cromwell as an assailant. None of the victims identified Wallace. One victim identified the defendant, but he stated that he thought the defendant was the driver.

At trial, Brooks, Cromwell and Wallace testified against the defendant pursuant to plea agreements. On direct examination, Brooks testified that the defendant was present during the robbery and at some point got out of the van to pick up a wallet that Cromwell had taken from a victim and thrown on the ground. He also testified that the defendant threw the wallet out of the van as they drove away. This testimony generally was consistent with testimony given by the victims and by Wallace and Cromwell, although Brooks' overall depiction of the evening's events varied from the testimony of others in several respects.

On cross-examination, Brooks changed his testimony. He testified that the defendant had been dropped off at a nightclub, Club Pyramid, prior to the robbery and was picked up after the robbery. Brooks testified that he was encouraged to implicate the defendant in order to get a favorable plea agreement. On redirect examination, the state questioned Brooks about the details of his plea proceedings, including his dialogue with the court, *Miano, J.*, during the plea proceedings[5]

[5] The following questioning on redirect examination by the state concerned Brooks' dialogue with Judge Miano during his plea hearing:

"Q. And when I indicated to Judge Miano, at the time of your plea, that [the defendant] was present in the van with you, Mr. Cromwell and Mr. Wallace was driving, and a discussion took place where it was agreed upon to rob some individuals in that parking lot, and the van did turn around and approach those individuals, and you got out and [the defendant] was present, you agreed with the facts that I expressed to the court [and that they were] the basis for the crime that you were pleading guilty to, correct?

"A. Yes, I agreed.

"Q. And part of that crime was conspiracy to commit robbery, [and that] was that you and others had an agreement to go and rob individuals—

"A. Right.

## and the facts to which Brooks had agreed to testify.

"Q. —is that correct?

"A. Right.

"Q. And you agreed to that factual basis as part of the conviction for conspiring to commit the robbery, correct?

"A. Right.

"Q. Do you recall Judge Miano indicating to you and asking you certain questions about your plea? He said, 'Sir, I'm going to ask you some questions, there's no rush, I want you to make sure you understand everything 100 percent. If there is something you don't understand, no matter how small or trivial it might appear, I want you to feel free to interrupt me and either consult with your attorney . . . who is seated there in the courtroom and, or interrupt me and ask me to explain it more clearly. All right, sir?'

"A. Yes.

"Q. And he asked you about the crime of robbery and the facts that I alleged constitute it, and you agreed with those facts?

"A. Yes.

"Q. And he asked you [that] if you had any thoughts or concerns or questions, that you should interrupt him?

"A. Yes.

"Q. And you never interrupted him and said, 'Oh, I'm sorry, Judge Miano, what [the prosecutor] says is not correct because [the defendant] wasn't there at all.' You never said that to the judge, did you?

"A. I said it in the beginning.

"Q. In the beginning, where?

"A. When you called me down there that day to talk to me before I even went in front of the—um, whatever, it was implicated that if I was called upon. So, I'm not thinking that I'm going to be called to testify against this man, and, and lie, so I just agreed with whatever was said. . . .

"Q. Mr. Brooks, isn't it true that you and I never spoke until after your plea was entered—

"A. Right.

"Q. —on January 27—

"A. Right.

"Q. —and Judge Miano indicated that as a part of that plea, you would continue to express the factual basis of your plea, including testifying against [the defendant], and after doing that and he accepted that plea and continued the case for sentencing, it was only at that point in time that you and I ever discussed anything about what you would particularly testify to in this trial; is that correct?

"A. Right.

"Q. And your lawyer . . . was there at the time?

"A. Right.

"Q. And my inspector, Steve Freddo, was there?

"A. Right.

"Q. Correct.

The state also asked Brooks about a conversation he had had with the prosecutor about going to trial. Prior to the conclusion of redirect examination, Brooks invoked his fifth amendment right and refused to testify further, precluding any opportunity for recross-examination by the defendant. The court denied the defendant's motion to strike Brooks' redirect testimony from the record.

On appeal, the defendant claims the court should have granted his motion to strike the state's redirect examination of Brooks. He argues that because he did not have the opportunity to question the witness about issues raised during redirect examination, he was deprived of his right to confront the witness under the sixth amendment to the United States constitution. We agree.

"When material new matters are brought out on redirect examination, the Confrontation Clause of the Sixth

---

"A. Right.

"Q. And we had a discussion, and at that time we said to you, 'We only want you to recall and say what you recalled as truthfully as you can without us putting any words in your mouth or telling you what to say.' Do you recall that?

"A. Yes.

"Q. And you recall saying, there, with your attorney, in front of us, that that's exactly what you were doing and that's what you were going to do? Remember saying that to us? . . .

"A. I remember saying, um—telling you what was happening, and you, being the good [prosecutor] that you are, just kept asking the same question and question, so I gave you what you wanted to hear.

"Q. Excuse me. Did you ever tell or say, at that conference, that I'm just going to tell you whatever you want to hear . . . ?

"A. No.

"Q. No, never said that. In fact, during the course of our discussions, isn't it true we had a discussion about [the defendant] going to trial on these factual bases with the evidence that the state had?

"A. Right.

"Q. And didn't you express concern about [the defendant] going to trial based on the evidence, including your testimony that was anticipated to say he was there during the robbery and participated; do you remember that?

"A. I remember that and I . . . Your Honor, can I talk to you?"

Amendment mandates that the opposing party be given the right of recross-examination on those new matters." *United States* v. *Riggi*, 951 F.2d 1368, 1375 (3d Cir. 1991). On redirect examination, the state raised new issues that had not been explored during direct examination, including Brooks' dialogue with Judge Miano at the plea canvass and a conversation between Brooks and a prosecutor regarding the plea. The defendant's inability to recross-examine the witness, therefore, is no different from a situation in which cross-examination has been precluded. See id., 1375–76.

"The primary interest secured by the confrontation clause of the sixth amendment is the right to cross-examination . . . . The sixth amendment is satisfied when the defendant is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Paredes*, 35 Conn. App. 360, 365, 646 A.2d 234, cert. denied, 231 Conn. 925, 648 A.2d 166 (1994); see also *State* v. *Castro*, 196 Conn. 421, 425, 493 A.2d 223 (1985).

"The extreme sanction of striking the testimony of a witness should be resorted to only where the invocation of the [fifth amendment] privilege blocks inquiry into matters directly relating to the crime charged and not those which are merely collateral . . . ." *State* v. *Valeriano*, 191 Conn. 659, 666–67, 468 A.2d 936 (1983), cert. denied, 466 U.S. 974, 104 S. Ct. 2351, 80 L. Ed. 2d 824 (1984). "To reconcile a defendant's rights under the confrontation clause with a witness' assertion of the fifth amendment privilege, a court must initially consider: (1) whether the matter about which the witness refuses to testify is collateral to his or her direct testimony, and (2) whether the assertion of the privilege precludes inquiry into the details of his or her direct testimony. . . . [T]he sixth amendment is violated

when a witness asserts the privilege with respect to a non-collateral matter *and* the defendant is deprived of a meaningful opportunity to test the truth of the witness' direct testimony." (Citations omitted; emphasis in original.) *Bagby* v. *Kuhlman*, 932 F.2d 131, 135 (2d Cir.), cert. denied, 502 U.S. 926, 112 S. Ct. 341, 116 L. Ed. 2d 281 (1991).

Our first inquiry is whether the matters about which Brooks refused to testify were collateral to his redirect testimony. "A subject of inquiry must serve to explore more than general credibility or it is collateral." (Internal quotation marks omitted.) *State* v. *Paredes*, supra, 35 Conn. App. 367. "Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him. . . . On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part . . . ." (Citations omitted.) *United States* v. *Cardillo*, 316 F.2d 606, 611 (2d Cir.), cert. denied, 375 U.S. 822, 84 S. Ct. 60, 11 L. Ed. 2d 55 (1963); see also *State* v. *Roma*, 199 Conn. 110, 117–18, 505 A.2d 717 (1986). "Evidence tending to show the motive, bias or interest of an important witness is never collateral or irrelevant. It may be . . . the very key to an intelligent appraisal of the testimony of the [witness]." (Internal quotation marks omitted.) *State* v. *West*, 274 Conn. 605, 641, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005).

The issues raised during the state's redirect examination of Brooks were not collateral matters. The details of Brooks' plea agreement, which included a promise to testify against the defendant and a recitation of the

facts to which he would testify, bore directly on the truthfulness of the testimony, not on his general character or credibility. Conversations with the prosecutor about going to trial also dealt directly with the truth of Brooks' testimony. This testimony was not collateral evidence of general bias because it explored more than general credibility. In contrast, in *Dunbar* v. *Harris*, 612 F.2d 690, 694 (2d Cir. 1979), the United States Court of Appeals for the Second Circuit held that it was unnecessary to strike direct examination testimony because it was collateral where on cross-examination the witness refused to answer questions related to his involvement in drug dealings other than those with which the defendant was charged. Information about the witness' drug dealings did not relate to his direct testimony or the crimes for which the defendant was charged. Id. In this case, the details of the plea agreement and conversations with the prosecutor related to the crime with which the defendant was charged and might have demonstrated why Brooks changed his testimony or what version of events was accurate. The details of the plea agreement, particularly the factual basis to which Brooks agreed at the plea hearing, was evidence of Brooks' potential bias or interest as to the crimes charged and directly relevant to the truth of those matters to which he testified; therefore it was not collateral or irrelevant.

We must next consider whether the assertion of the privilege precluded inquiry into the details of Brooks' redirect testimony. "The question is whether the defendant's inability to examine the witness precludes [the] defendant from testing the truth of the witness' direct testimony . . . or whether the answers solicited might have established untruthfulness with respect to specific events of the crime charged." (Internal quotation marks omitted.) *State* v. *Paredes*, supra, 35 Conn. App. 367.

The defendant did not have the opportunity to test the truth of Brooks' testimony with regard to the details of his conversation with Judge Miano at the plea hearing and his conversation with the prosecutor prior to the defendant's trial. These issues were directly relevant to the truth of Brooks' direct testimony because they explored whether he had agreed to testify about his understanding of the facts or some other version of the facts urged by the prosecutor. These issues were raised for the first time during redirect examination, and because Brooks refused to testify any further, the defendant did not have any opportunity to test the truth of Brooks' statements. We conclude that it was improper to allow the jury to consider the redirect testimony of Brooks because the issues raised on redirect were not collateral, and the defendant did not have the opportunity to test the truth of the Brooks' testimony.

Having determined that the court acted improperly by not striking the redirect testimony, we must determine whether the error was harmful. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware* v. *Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

The court's failure to strike Brooks' redirect testimony was not harmless. The court allowed the state to explore the details of Brooks' plea agreement and

conversations with the prosecutor, but blocked the defendant's opportunity to do the same. This witness' exculpatory evidence was very important to the defendant's case. Further, none of the victims conclusively identified the defendant from a photographic array shortly after the robbery.[6] The testimony of the coconspirators, therefore, was the only direct evidence that linked the defendant with the crime. Their testimony and the testimony of the victims varied in several respects, notably the number and actions of the assailants during the robbery. Both of the other coconspirators, Wallace and Cromwell, had accepted plea agreements in exchange for their testimony implicating the defendant. They were subject to the same motive and bias of implicating another conspirator in exchange for a lenient sentence that was the subject of Brooks' redirect examination. We conclude that the failure to strike Brooks' redirect examination was not harmless.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

---

[6] Of the seven victims who viewed photographic arrays, including the defendant's photograph on the night of the robbery, only one victim identified the defendant as an assailant. That victim stated that he thought the defendant was the driver of the van, but this was inconsistent with all other evidence presented.